In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 06-4008 & 07-1287

CHRISTIANA O. ATUNNISE,

*Petitioner,*

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent.*

_____

Petitions for Review of Orders of the
Board of Immigration Appeals.
No. A98-750-662

_____

ARGUED SEPTEMBER 28, 2007—DECIDED APRIL 30, 2008

_____

Before ROVNER, WOOD, and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* This case highlights the obstacles that foreigners face in navigating arcane procedures intended to reunite them with their American-citizen spouses in the United States. Here the apparent hurdle was a form that only a consummate bureaucrat could earnestly defend. Christiana Atunnise, a Nigerian citizen, initially tried to sidestep the rules in 1998 when she used a fraudulent passport in a misguided attempt to join her husband, a Nigerian citizen who was living lawfully in Chicago. She was caught at the airport and sent back

to Nigeria the very next day. As a consequence, Atunnise
was statutorily barred from entering the United States
for a period of five years, and even then she would for-
ever need the Attorney General's permission—a "waiver
of inadmissibility" in immigration jargon—to gain admis-
sion. Atunnise waited out the five-year period, and soon
after, in 2004, her husband became a United States citizen.
He promptly petitioned immigration authorities for
permission to bring Atunnise and their five-year-old
daughter to live with him in the United States, and after
that petition was approved, Atunnise went to the United
States consulate in Lagos, Nigeria, to obtain a visa. The
consular officer gave her a visa, but because of the man-
ner in which Atunnise answered one of the questions on
the visa application, she was not told that consular offi-
cers are not supposed to give someone in her position a
visa without a waiver of inadmissibility. Atunnise main-
tains that she was confused by the application, which
we agree would confuse anyone. When Atunnise took her
visa and flew to the United States with her daughter in
April 2006, an immigration officer at O'Hare International
Airport realized that she also needed, but did not have,
a waiver of inadmissibility. She has been in jail ever
since, all because immigration officials have taken the
position that even though she might have qualified for
a waiver of inadmissibility, she has lost her opportunity
to apply. That position, we conclude, is premised on a
mistaken view of the law. Accordingly, we remand her
case to the Board of Immigration Appeals for further
proceedings.

## I. Background

After Atunnise's husband became a United States citizen
in 2004, he filed a Petition for Alien Relative, Form I-130,

seeking permission to bring Atunnise and their daughter, Ifeoluwa, to join him in Chicago. An I-130 petition allows a citizen or permanent resident to request that the Department of Homeland Security ("DHS") classify certain alien family members, including a spouse and children, as "immediate relatives" who thus become eligible for immigrant visas without regard to normal quotas. DHS approved the I-130 petition in December 2005. Three months later, in March 2006, Atunnise went to the American consulate in Lagos to apply for a K-3 nonimmigrant visa. A K-3 visa allows a beneficiary of an I-130 petition to enter the United States to await the availability of an immigrant visa. *See* 8 U.S.C. § 1101(a)(15)(K)(ii). Atunnise also applied for an equivalent visa, a K-4, for her daughter. *See id.* § 1101(a)(15)(K)(iii).

The general, nonimmigrant-visa application given to Atunnise, Form DS-156, includes a series of questions in bulletpoint form. Although most of the bulletpoints incorporate multiple questions, and all of them include compound questions, the applicant must respond to each bulletpoint by checking a single box "yes" or "no." There is no means of giving independent answers to the varied questions within the same bulletpoint. One of the bulletpoints poses the following questions:

> Have you ever been refused admission to the U.S., or been the subject of a deportation hearing, or sought to obtain or assist others to obtain a visa, entry into the U.S., or any other U.S. immigration benefit by fraud or willful misrepresentation or other unlawful means? Have you attended a U.S. public elementary school on student (F) status or a public secondary school after November 30, 1996 without reimbursing the school?

The form permits the applicant to give one yes-or-no response to these unrelated questions, and it neither invites nor provides any space for the applicant to explain an answer. Atunnise had been subjected to expedited removal in 1998 after she attempted to enter the United States with a fraudulent passport—but she had never attended a public school in the United States. She checked the "no" box. The consular officer then overlooked the 1998 removal (we are not told whether the consular officer took steps to access that information through DHS records) and, as a result, did not inform Atunnise that she needed a waiver of inadmissibility to enter the United States. And so she did not apply for one, even though as a K-3 applicant she may have been eligible for a waiver of inadmissibility under § 212(d)(3) of the Immigration and Nationality Act ("INA"). That provision authorizes the Attorney General to waive inadmissibility for a nonimmigrant. 8 U.S.C. § 1182(d)(3)(A); 8 C.F.R. § 212.7(a)(1)(i). Had the consular officer noticed the bar to admissibility, the officer presumably would have alerted Atunnise that she needed to file, in addition to her visa application, an application for a waiver under § 212(d)(3). *See* 8 C.F.R. § 212.7(a)(1)(i). But because of the oversight, the consular officer issued visas to Atunnise and her daughter, and Atunnise left the consulate without applying for a waiver.

Less than two weeks later, on April 7, 2006, Atunnise and the child arrived at O'Hare and presented their passports and visas to an immigration officer. After a fingerprint check alerted the officer to her 1998 removal, the officer asked Atunnise whether she had ever been denied admission to the United States. She truthfully answered that she had and explained the circumstances. Accordingly, the officer concluded that Atunnise could not be admitted

without a waiver of inadmissibility. And since she did not have one, the officer presumed that her K-3 visa was invalid. Atunnise was detained and taken to a jail in McHenry County, Illinois, where she has remained ever since. The child was released to her father's care.

DHS issued a notice to appear charging that Atunnise was subject to removal under § 212(a)(6)(C)(i) of the INA, which provides that "any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible." 8 U.S.C. § 1182(a)(6)(C)(i). The supporting allegation specified that on April 7, 2006, Atunnise had attempted to enter the United States by fraud or willful misrepresentation because, supposedly, she had failed to disclose her 1998 expedited removal when she applied in Lagos for her K-3 visa. DHS filed an additional charge pursuant to § 212(a)(7)(A)(i) of the INA, which provides that an immigrant who does not possess a valid entry document is inadmissible. *See* 8 U.S.C. § 1182(a)(7)(A)(i). The supporting allegation specified that on April 7, 2006, Atunnise presented herself for admission without a valid entry document; i.e., DHS asserted that the K-3 visa given to Atunnise in Lagos was invalid. Atunnise denied both charges.

In July 2006 an immigration judge ("IJ") conducted a final removal hearing to consider these charges. Atunnise's attorney argued that she is "almost illiterate" and speaks only limited English, and thus had been especially confused when confronted with the multiple questions within the bulletpoints on her visa application. Counsel pointed out that when the immigration officer at O'Hare asked

Atunnise directly whether she had previously been re-
moved, she answered truthfully. The government did not
dispute that its Form DS-156 is ambiguous, but still
tersely declared that Atunnise had lied in answering the
quoted bulletpoint. It was "inconsequential," the govern-
ment insisted, that the bulletpoint allowed Atunnise only
one "yes" or "no" answer to wholly unrelated questions.

Atunnise argued in the alternative that, if the IJ found
her inadmissible, she was eligible for a waiver. Earlier in
the removal proceedings Atunnise's counsel had filed
an application for a waiver of inadmissibility using Form
I-601. Aliens use the I-601 to apply for various waivers
of inadmissibility authorized by § 212 of the INA, including
those under sections 212(d)(3) and 212(i). As noted,
§ 212(d)(3) benefits nonimmigrants, whereas § 212(i)
allows the Attorney General to waive inadmissibility for
an immigrant if refusing admission would result in
"extreme hardship" to the immigrant's citizen-spouse.
8 U.S.C. § 1182(i)(1); 8 C.F.R. § 212.7(a)(1). The I-601 does
not provide a space for the alien to specify what type of
waiver is sought, but previously the IJ had asked Atunnise
to specify "any and all applications for relief" that she
was seeking. The IJ did not advise Atunnise about the
available types of relief for which she might qualify, and
her attorney said only that Atunnise was seeking relief
under § 212(i).

The IJ rendered an oral decision finding Atunnise inad-
missible and also ineligible for any waiver of inadmis-
sibility. The IJ emphasized that it was Atunnise's burden
to establish admissibility, and reasoned that she had
offered "no evidence" to support her contention that she
truthfully completed her DS-156. And, the IJ continued,
even if Atunnise had made an innocent mistake on her

application in March 2006, she would still be inadmissible, because, according to the IJ, "the 1998 fraud alone subjects her to inadmissibility on the 212(a)(6) ground." As for the § 212(a)(7) charge, the IJ reasoned that Atunnise had not "properly procured" her K-3 visa and thus was inadmissible on that ground as well. Finally, the IJ concluded that Atunnise was ineligible for a waiver of inadmissibility under § 212(i) because that relief is reserved for immigrants but she held a nonimmigrant K-3 visa.

The Board of Immigration Appeals ("BIA") agreed with the IJ that Atunnise was inadmissible based on her 1998 fraud regardless of whether she committed fraud in connection with her 2006 visa application. The BIA also agreed with the IJ that Atunnise was ineligible for a § 212(i) waiver, which is reserved for immigrants. Accordingly, the BIA dismissed Atunnise's appeal.

Atunnise moved the BIA to reconsider, arguing that a K-3 visa—though technically a nonimmigrant visa—functions as a "hybrid visa" because its very purpose is to expedite the entry and permanent residence of the holder. Accordingly, she reasoned that the § 212(i) waiver of inadmissibility should be available to her as a K-3 visa holder. In the alternative, she argued that the IJ should have evaluated her eligibility for a § 212(d)(3) waiver, which is available to nonimmigrants and is obtained via the same I-601 that she used during the removal proceedings to apply for a § 212(i) waiver. The BIA denied the motion, concluding that a K-3 visa is unambiguously a nonimmigrant visa, and thus there was no error in its decision that Atunnise is ineligible for a § 212(i) waiver. The BIA also concluded that Atunnise had lost her opportunity to apply for a § 212(d)(3) waiver by not explicitly seeking that relief before the IJ.

In November 2006 Atunnise filed a timely petition for review of the BIA's order dismissing her appeal, and in February 2007 she filed a petition for review of the BIA's denial of her motion to reconsider. We consolidated the two petitions.

## II. Analysis

Atunnise does not challenge the IJ's finding that she is inadmissible, and in fact she concedes that based on her 1998 fraud she is inadmissible without a waiver. We find her concession surprising because Atunnise was never charged with being inadmissible based on her 1998 fraud; she was charged with fraud in connection with her 2006 visa application. *See* 8 C.F.R. § 1003.15(b); *Brown v. Ashcroft*, 360 F.3d 346, 351 (2d Cir. 2004) (noting that a notice to appear must include a description of the conduct alleged to violate the law). And although the IJ maintained throughout the removal proceedings that it was Atunnise's burden to prove that she is admissible, it was in fact the government's burden to prove the fraud charge with clear and convincing evidence that Atunnise willfully concealed or misrepresented a material fact and that her misrepresentation resulted in her obtaining her visa. *See Kalejs v. INS*, 10 F.3d 441, 446 (7th Cir. 1993); *Monter v. Gonzales*, 430 F.3d 546, 553-55 (2d Cir. 2005); *Mwongera v. INS*, 187 F.3d 323, 330 (3d Cir. 1999); *Forbes v. INS*, 48 F.3d 439, 441-43 (9th Cir. 1995). The government submitted no evidence—none at all—that Atunnise committed fraud in connection with her K-3 visa application.

What the government did, and what it continues to do here, is declare that Atunnise lied simply because the "no"

box she checked on her DS-156 is not the right answer to the question in the bulletpoint that the government conveniently supposes she was answering. But "no" is the correct answer to the other question in the same bulletpoint, and the government's unwillingness to confront that untidy detail is disingenuous. There is a reason why courts disfavor compound questions posed to witnesses during trial; they are likely to elicit an ambiguous response. *See* 81 AM. JUR. 2D WITNESSES § 714 (2008) ("The vice of the compound question is generally recognized, and a question which embraces several questions is improper."). Suppose a judge on this court is told that she must check either "yes" or "no" to this bulletpoint: "Is the United States Court of Appeals for the Seventh Circuit located in Chicago, Illinois? Is Chicago's N.F.L. team named the Packers?" Both responses would be correct. And, depending on who is scoring the answers, both responses also would be incorrect. That is the position Atunnise finds herself in.

The government insists that it should be allowed to wait and see what box is checked before deciding which question the applicant was answering. And because here the government divined that Atunnise was responding to the first and not the second question in the bulletpoint, it charged her under § 212(a)(6)(C)(i) with fraud. That position, we believe, would be difficult to sustain.

The same must be said about the charge under § 212(a)(7)(A)(i). That provision of the INA specifically bars admission to *immigrants* who lack appropriate documentation. *See* 8 U.S.C. § 1182(a)(7)(A)(i). Throughout these proceedings, however, the government has taken the position that Atunnise's status as a K-3 visa holder means that she can be characterized only as a *nonimmigrant*,

not as an immigrant. Section 212(a)(7)(B) is the parallel provision for nonimmigrants, *see* 8 U.S.C. § 1182(a)(7)(B), but Atunnise was never charged with violating that section.

It is arguable, then, that the government never proved the only charges of inadmissibility it lodged against Atunnise. But given her concession that her 1998 fraud renders her inadmissible without a waiver, we turn to Atunnise's arguments that the BIA erred as a matter of law when it concluded that she was ineligible for a waiver of inadmissibility under § 212(i) and had lost her chance to seek a waiver under § 212(d)(3). We review the BIA's legal conclusions de novo. *Balliu v. Gonzales*, 467 F.3d 609, 612 (7th Cir. 2006).

Atunnise argues that the BIA erred in concluding that she is ineligible for a § 212(i) waiver because, according to her, even though the waiver "technically" is available only to immigrants, Congress intended for holders of K-3 nonimmigrant visas to qualify for the waiver. By its express terms, the § 212(i) waiver is available "in the case of an *immigrant* who is the spouse . . . of a United States citizen . . . if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such *immigrant* alien would result in extreme hardship to the citizen." 8 U.S.C. § 1182(i)(1) (emphasis added). The statute specifically excludes K visa holders from the definition of "immigrant"—"immigrant" is defined broadly but does not include aliens who seek to enter the United States pending the approval of an immigrant visa. *See* 8 U.S.C. § 1101(15)(K)(ii) (emphasis added); *see also* 8 C.F.R. § 245.1(c)(6)(ii) (stating that a K-3 visa holder is a nonimmigrant as defined in 8 U.S.C. § 1101(15)(K)). Nonetheless, Atunnise argues that her status as a nonimmigrant is a technicality, and

that the K-3 visa functionally confers on her a hybrid status that "occupies unique space apart from immigrant and nonimmigrant status." This is so, she argues, because K-3 visa holders have no intent to return permanently to their foreign domicile and instead intend to reside in the United States with their citizen spouses. Atunnise argues that the BIA's finding that she is statutorily ineligible for a § 212(i) waiver based on her technical nonimmigrant status thwarts Congress's intent to facilitate the reunification of K-3 visa holders and their citizen spouses.

Although there is some logical appeal to Atunnise's characterization of the K-3 visa (especially given that she was charged as an immigrant), to credit her argument would require us to ignore the canon that plain and unambiguous statutes must be applied as written. *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002); *United States v. Farr*, 419 F.3d 621, 625 (7th Cir. 2005). Even if allowing K-3 visa holders to obtain a § 212(i) waiver might be consistent with Congress's purpose to reunite aliens with their citizen spouses while waiting for an I-130 petition to be approved or an immigrant visa to be issued, we "may not overlook the statute's plain language to further what may be a broader statutory purpose." *Farr*, 419 F.3d at 625. And here the statute plainly states that the § 212(i) waiver is available to immigrants, and the defining provision excludes K-3 visa holders from the definition of "immigrant." Accordingly, the BIA did not err as a matter of law in finding Atunnise statutorily ineligible for the § 212(i) waiver.

Atunnise also argues that the BIA erred as a matter of law when it denied her motion to reconsider on the ground that she could not pursue a waiver of inadmissi-

bility under § 212(d)(3) because she did not specifically mention that provision before the IJ. Our view of this contention is necessarily framed by our previous discussion of the poorly constructed DS-156 that the government gave to Atunnise at the consulate in Lagos. Aliens who need a waiver of inadmissibility to obtain a K-3 visa typically apply for that waiver at the consulate when they apply for their visa. *See* 8 C.F.R. §§ 212.4(a)(1), 212.7(a)(1)(i). The consular officer assesses whether the alien needs a waiver; an alien "who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such a visa" may receive a waiver of inadmissibility. 8 U.S.C. § 1182(d)(3)(A). From the government's vantage, this is an instance where an alien falsified an answer on a DS-156 and thus obtained a visa through fraud. We have already rejected that view of the evidence, and what we are left with instead is a situation where a consular officer did not realize that a K-3 applicant should apply for a waiver of inadmissibility because the form created to signal the need for that benefit is fatally flawed. The government does not contend that the Attorney General would have denied a waiver under § 212(d)(3) had she applied for one in Lagos, and so it seems that Atunnise's "no" answer to one confusing bulletpoint is the reason she has been detained in a cell for two years. Consular officers apparently have "access to the State Department's primary visa look-out system (CLASS), which contains the names of persons . . . who might be ineligible for a visa should they apply for one." AUSTIN T. GRAGOMEN, JR. ET AL., IMMIGRATION PROCEDURES HANDBOOK § 10.19 (Thomson West 2007-2008 ed.). We cannot say whether running that computer check would have averted this regrettable situation, but plainly the government has invited contro-

versy by economizing on bulletpoints in its DS-156. Had the government drafted a straightforward question asking whether Atunnise had ever been refused entry or removed from the United States, she either would have checked "yes"—in which case the consular officer would have alerted her to apply for the § 212(d)(3) waiver—or she would have checked "no"—in which case the government would have had a plausible fraud case.

Bearing this context in mind, we agree with Atunnise that the BIA erred as a matter of law when it held that she lost her opportunity to seek a § 212(d)(3) waiver by not specifically asking for that relief until her motion to reconsider. According to the BIA, a § 212(i) waiver was the only specific relief Atunnise sought within the deadline framed by the IJ. But as soon as it became apparent to Atunnise that she needed a waiver of inadmissibility to enter the United States, she filed her I-601 application with the IJ. Form I-601 is the form used to apply for a waiver under both § 212(i) and § 212(d)(3). *See* 8 C.F.R. § 212.7(a)(1)(i). Nowhere does that form provide room for the alien to specify under which statutory provision she is seeking a waiver. In fact, the form pointedly instructs the alien not to write in the only space that provides room to designate the relief sought.

Moreover, as Atunnise points out, it was the IJ's duty during the removal proceedings to alert her about all the avenues of relief available and afford her an opportunity to apply. *See* 8 C.F.R. § 1240.11(a)(2); *Asani v. INS*, 154 F.3d 719, 727 (7th Cir. 1998) (holding that an IJ must inform aliens of rights even where alien is represented by counsel). The relevant regulation states that in "conjunction with any application for creation of status of an alien lawfully admitted for permanent residence," where the

alien applies to the IJ for a waiver of inadmissibility, the IJ "shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing." 8 C.F.R. § 1240.11(a)(2). The government argues that the regulation does not apply here because Atunnise was neither lawfully admitted nor eligible for permanent residency, but that is incorrect; K-3 visa holders are eligible to apply for permanent residency. *See* 8 C.F.R. § 245.1(c)(6)(ii). By obtaining a K-3 visa, Atunnise completed the first step toward the creation of status as an alien lawfully admitted for permanent residence, yet when she applied for a waiver of inadmissibility using form I-601 the IJ did not inform Atunnise that she might be eligible for a § 212(d)(3) waiver, let alone consider whether she was eligible. *Cf. Pede v. Gonzales*, 442 F.3d 570, 571 (7th Cir. 2006) (holding that IJ has no duty to alert alien about availability of potential relief that IJ already has evaluated and determined to be unavailable). Because the IJ did not discharge this duty, Atunnise did not waive her opportunity to seek § 212(d)(3) relief when she did not specifically identify that form of relief during the removal proceedings. *See Asani*, 154 F.3d at 727.

The government now defends the BIA's ruling by arguing that Atunnise is not eligible for § 212(d)(3) relief because she did not apply for a waiver when she filled out her visa application at the consulate in Nigeria. The government relies on 8 C.F.R. § 212.7, which states that an applicant for a K visa seeking a waiver of inadmissibility "shall file an application on Form I-160 at the consular office considering the visa application." But neither the IJ nor the BIA decided whether it was too late after

she entered removal proceedings for Atunnise to seek a § 212(d)(3) waiver, and under *SEC v. Chenery Corp.*, 332 U.S. 194 (1947), the government may not defend the agency's ruling on a ground that is not articulated—or at least discernable—in the decision itself. *See Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007); *Gebreeyesus v. Gonzales*, 482 F.3d 952, 956 (7th Cir. 2007); *Mengistu v. Ashcroft*, 355 F.3d 1044, 1046-47 (7th Cir. 2004).

In any event, the government cites no persuasive authority demonstrating that it became too late for Atunnise to seek the § 212(d)(3) waiver when she arrived at the border. The regulation directing that an application for a § 212(d)(3) waiver be filed at the consular office must be read in connection with the statute itself, which specifies that the consular officer can recommend that the alien receive a waiver where the officer knows or believes the waiver is necessary. *See* 8 U.S.C. § 1182(d)(3)(A); 8 C.F.R. § 212.7(a)(1)(i). But here the government prevented the consular officer in Lagos from discovering that Atunnise needed a waiver because it used an incoherent form to determine her admissibility and then apparently took no steps to cross-check her information through any database. And now that Atunnise has used her government-issued visa to come to the United States the government has taken the position that it is too late for her to apply for the waiver. It takes this position without even acknowledging—let alone defending—the role its ineffective screening methods played in Atunnise's failure to apply for the waiver in Lagos.

At oral argument the government relied heavily on the BIA's decision in *Matter of Fueyo*, 20 I. & N. Dec. 84 (BIA 1989), to support its argument that it is too late

now that removal proceedings are underway for Atunnise to apply for a § 212(d)(3) waiver. In *Fueyo*, the BIA held that an alien who entered the United States illegally and was in deportation proceedings could not apply for a waiver under § 212(d)(3)(B) because, "[b]y its very nature, the relief sought can only confer advance permission for a future entry, and the statute and regulations make no provision for this waiver to be granted retroactively." *Id.* at 87. But Atunnise is not proposing a retroactive grant because by virtue of her detention she has not yet entered the United States. She has been held in limbo at the border for almost two years and is still seeking entry. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (noting that the "distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law"); *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958) (noting that "the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States"); *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2007) (noting that even though paroled aliens are physically present in the United States "they nevertheless remain constructively detained at the border"); *Sidhu v. Ashcroft*, 368 F.3d 1165 (9th Cir. 2004) (holding that alien taken into custody following detention at airport did not enter the United States). Atunnise arrived with a visa that she believed was valid, and as soon as it was discovered that she needed a waiver—a waiver she could have received in Nigeria had it not been for the inept bureaucratic form—she filed the necessary form.

As a practical matter, we see no reason why Atunnise would not still be eligible for a § 212(d)(3) waiver. Even if

she is required to file her I-601 with the consular office, nothing in the regulation states that she has to be physically present in Lagos to do so. The regulations require a visa applicant to "personally appear before and be interviewed by a consular officer," 22 C.F.R. § 41.102(a), but Atunnise has already met that requirement, and even if she had not, the consular officer could waive personal appearance in this "unusual circumstance," *see id.* § 41.102(b)(6). And in any event, the consular officer does not have the authority to grant a § 212(d)(3) waiver—whether an alien qualifies is a decision that is always left to "the discretion of the Attorney General." 8 U.S.C. § 1182(d)(3)(A). And as Atunnise notes, the IJ has the catchall authority during removal proceedings "to take any action consistent with applicable law and regulations as may be appropriate." 8 C.F.R. § 1240.1(a). Indeed, in other cases the BIA has approved of an alien applying for a similar waiver before an IJ when the alien has not yet been admitted to the United States. *See Matter of Kazemi*, 19 I. & N. Dec. 49, 52 (BIA 1984) (holding that the BIA has jurisdiction during exclusion proceedings to consider an application for waiver of inadmissibility under § 212(d)(4)); *Matter of LeFloch*, 13 I. & N. Dec. 251, 255 (BIA 1969) (noting that alien may apply for § 212(d)(4) waiver of inadmissibility during exclusion proceedings). At best, the government has shown that applying for a § 212(d)(3) waiver at the consulate at the time an alien applies for her visa is the typical procedure, but it points to no authority that would preclude Atunnise from seeking that waiver after she left Nigeria but before she enters the United States.

Because the BIA erred as a matter of law in applying the principles of waiver in Atunnise's case, we grant the petition to review the BIA's decision dismissing her

initial appeal and vacate the IJ's order of removal. We also grant the petition to review the BIA's denial of Atunnise's motion to reconsider and remand so that the BIA may consider whether she is eligible for a § 212(d)(3) waiver. And in considering her eligibility for that relief, we are confident that the BIA will take into account the unique facts of this case and the exceptional hardship that Atunnise and her family have endured.