### The PEOPLE of the State of Colorado, Complainant:

v.

### Robert S. McCORMICK, Respondent.

### No. 10PDJ084.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Dec. 23, 2011.

---

## OPINION AND DECISION DISMISSING COMPLAINT PURSUANT TO C.R.C.P. 251.19(b)(1)

### I. *SUMMARY*

Respondent was hired to provide advice about whether a Mexican national, who was married to a U.S. citizen, could obtain lawful residency in the United States. The People allege Respondent violated Colo. RPC 1.1, 1.3, and 1.4(a) by providing incorrect legal advice to his clients and by inadequately communicating with them. The Hearing Board does not find clear and convincing evidence supporting the People's claims. Accordingly, we dismiss the People's complaint in its entirety.

### II. *PROCEDURAL HISTORY*

The People filed a complaint in this case on August 4, 2010, alleging Respondent violated Colo. RPC 1.1, 1.3, and 1.4(a). Respondent answered on September 13, 2010, and later amended his answer on June 8, 2011.[1] Although a hearing was originally set to begin on February 28, 2011, the PDJ granted a request by Respondent's counsel for a continuance, and the hearing was rescheduled for July 19, 2011.

Respondent filed a motion on June 27, 2011, in which he argued the disciplinary matter should be dismissed, contending the action was barred by the statute of limita-

---

1. Respondent represented himself in this matter until January 6, 2011, when Mr. Jackson entered his appearance on Respondent's behalf.

tions and laches. After receiving the People's response on July 12, 2011, the PDJ denied Respondent's motion on July 13, 2011.

On July 11, 2011, Respondent filed a motion to compel, arguing that his client, Regulo Flores–Garcia ("Flores–Garcia"), had failed to provide documents as required by a *subpoena duces tecum*. The People responded on July 13, 2011, and the PDJ denied Respondent's motion that same day. Also on July 13, 2011, the PDJ granted Respondent's request to continue the hearing and rescheduled it for October 20, 2011. On October 3, 2011, Respondent filed a second motion to compel Flores–Garcia's compliance with a *subpoena duces tecum*. The People responded on October 5, 2011, and the PDJ denied Respondent's motion on October 7, 2011.

During the hearing on October 20 and 21, 2011, the Hearing Board heard testimony from Respondent, Nancy Elkind, Evelyn McCormick, Adela Rivas, and Lourdes Rodriguez.[2] Flores–Garcia did not testify. The PDJ admitted the People's exhibits 1–12, 14–33, 35–37, and 39, as well as Respondent's exhibits A, C–K, M–P, and R.[3] In addition, with leave from the PDJ, both parties filed written closing arguments on October 28, 2011.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on May 25, 1983, under attorney registration number 12870.[4] He is

thus subject to the jurisdiction of the Hearing Board in these disciplinary proceedings.[5]

### Relevant Immigration Law

This disciplinary case concerns legal advice Respondent provided regarding an immigration matter. We provide a brief overview of pertinent immigration law before discussing Respondent's representation.

First, several governmental agencies are vested with authority over immigration matters. Visas are issued by U.S. consulates, which are units of the State Department. Before March 1, 2003, immigration matters other than consular matters were primarily handled by the Immigration and Naturalization Service ("INS"). On March 1, 2003, INS ceased to exist; its responsibilities were divided among agencies in the newly formed Department of Homeland Security ("DHS"), one of which, as relevant here, is Citizenship and Immigration Services ("USCIS").[6] The State Department and DHS have issued separate regulations and guidance governing administration of the Immigration and Nationality Act ("INA").[7]

The INA restricts admission[8] into the United States by persons who are not U.S. citizens or nationals, denominated "aliens."[9] An alien who has entered the United States without being admitted or paroled is deemed to be unlawfully present.[10] If an alien has been unlawfully present in the United States for more than one year, he or she is presumptively inadmissible—that is, barred from lawful re-entry—for ten years from the date he or she leaves the United States, under the "waivable ten-year bar."[11]

---

2. In assessing the testimony and evidence presented in this matter, the Hearing Board is governed by C.R.C.P. 251.18(d), which provides in part that "proof shall be clear and convincing evidence."

3. The People's exhibits 1–7, 9–12, 14–33, 35–37, and 39 were stipulated, as were Respondent's exhibits A, D–F, J–K, and R.

4. Respondent's registered business address is 2828 North Speer Boulevard, Suite 103, Denver, Colorado 80211.

5. *See* C.R.C.P. 251.1(b).

6. *See* 6 U.S.C. §§ 251, 271, 291.

7. The INA is contained in Title 8 of the United States Code. DHS's regulations are codified in Title 8 of the Code of Federal Regulations; the State Department's appear in Title 22.

8. Admission is defined as the "lawful entry of [an] alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

9. 8 U.S.C. § 1101(a)(3).

10. *See* 8 U.S.C. § 1182(a)(6), (a)(9)(B).

11. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(II). Under a closely related statute, an alien who voluntarily departs the United States after having been pres-

Among the possible waivers of this bar is the "hardship waiver," which is available to an alien who is married to a U.S. citizen and who can demonstrate that refusal of admission would cause exceptional hardship for the alien's spouse.[12]

By contrast, an alien who unlawfully re-enters or attempts to re-enter the United States after having previously entered the country unlawfully and stayed for more than one year is subject to the "non-waivable ten-year bar."[13] This means the alien is ineligible for a hardship waiver and cannot legally reenter the United States for at least ten years.[14] The hardship waiver also is unavailable for an alien who has been subject to an order of removal.[15]

We now turn from standards governing admissibility to the process for legally entering the United States. In most instances, a foreign national must apply for a visa before traveling to the United States. There are two types of visas: non-immigrant visas, which grant temporary permission to enter the country, and immigrant visas, which authorize permanent residency.[16] A visa does not itself guarantee entry into the United States, but rather permits a foreign national to arrive at a port of entry and be examined for admissibility by an immigration officer.[17]

A foreign national who is engaged or married to a U.S. citizen must follow certain procedures to obtain a visa based upon that relationship. A K–1 nonimmigrant visa is available for a U.S. citizen's fiancé(e) who seeks to enter the United States in order to marry the U.S. citizen.[18] The first step is for the U.S. citizen to file Form I–129F with USCIS, providing information about the intended marriage.[19] Upon approval of that application, the foreign national may obtain a K–1 visa at a U.S. consulate, as long as he or she is also eligible for an immigrant visa.[20] The foreign national must marry his or her fiancé(e) within ninety days of entering the United States[21] and subsequently may adjust his or her status to that of a lawful permanent resident.[22]

There are two different routes by which a foreign spouse of a U.S. citizen may obtain permanent residency: through an immigrant visa or a nonimmigrant visa.[23] Under the first option—the immigrant visa route—the U.S. spouse first files Form I–130[24] to document the marital relationship, then the foreign spouse files an application for an immigrant visa and attends a consular visa interview.[25]

The second path to obtaining permanent residency—the non-immigrant visa route—is intended to shorten the time spouses are physically separated, by permitting a foreign

ent unlawfully for more than 180 days but less than one year is subject to a three-year bar on admissibility. 8 U.S.C. § 1182(a)(9)(B)(i)(I).

12. 8 U.S.C. § 1182(a)(9)(B)(v).

13. 8 U.S.C. § 1182(a)(9)(C)(i)(I).

14. 8 U.S.C. § 1182(a)(9)(C)(i)-(ii).

15. 8 U.S.C. § 1182(a)(9)(C)(i)(II). In general terms, an order of removal is an order determining that an alien is inadmissible or deportable. See 8 U.S.C. § 1229(a)(i).

16. See 8 U.S.C. § 1201(a).

17. See 8 U.S.C. § 1201(h).

18. 8 U.S.C. § 1101(a)(15)(k)(i).

19. 8 U.S.C. § 1184(d)(1).

20. 22 C.F.R. § 41.81(d).

21. 8 U.S.C. § 1101(a)(15)(k)(i).

22. See 8 U.S.C. § 1255(d).

23. Department of State, *Immigrant Visa for a Spouse or Fiance(e) of a U.S. Citizen*, http://travel.state.gov/visa/immigrants/types/types_1315.html (last visited Dec. 19, 2011).

24. "An I–130 petition allows a citizen or permanent resident to request that [DHS] classify certain alien family members, including a spouse and children, as 'immediate relatives' who thus become eligible for immigrant visas without regard to normal quotas." *Atunnise v. Mukasey*, 523 F.3d 830, 832 (7th Cir.2008). Approval of an I–130 alone does not grant a foreign national permission to enter the United States.

25. Department of State, *Immigrant Visa for a Spouse of a U.S. Citizen (IR1 or CR1)*, http://

spouse to obtain a K–3 non-immigrant visa [26] abroad and then enter the United States to await approval of the immigrant visa petition.[27] After the U.S. spouse has filed Forms I–130 and I–129F and the immigrant visa application is pending, the foreign spouse applies for a K–3 visa in the U.S. consulate of the country where the marriage took place.[28] Once the consulate issues that visa, the beneficiary can travel to the United States to await processing of the immigrant visa petition.[29]

The visa processes outlined above are only part of the procedure a foreign national engaged or married to a U.S. citizen must follow if the foreign national is subject to the waivable ten-year bar. In that case, after filing a visa application, the foreign national must file Form I–601 at a U.S. consulate to obtain a hardship waiver.[30] The applicant has the burden to prove his or her eligibility for the waiver.[31] The consulate typically forwards waiver applications to USCIS, which has authority to approve or reject them.[32]

### Representation of Adela Rivas and Regulo Flores–Garcia

In November 2002, Respondent met with Adela Rivas ("Rivas"), a U.S. citizen, and Flores–Garcia, a Mexican national. At the time, Respondent had been practicing immigration law in northern Colorado for five years.[33] Rivas and Flores–Garcia, who were romantically involved, sought Respondent's advice on how Flores–Garcia could obtain legal status in the United States. At the time, Rivas was married to another Colorado resident, but she was considering filing for divorce. Flores–Garcia was in a common-law marriage with a woman living in Mexico.[34]

According to Respondent, Flores–Garcia mentioned during their initial meeting that he had first entered the United States via bus in 1999. Flores–Garcia told Respondent that an immigration officer in Tijuana, Mexico had inspected him and allowed him to proceed into California, but he received no written authorization to cross the border. At the disciplinary hearing, Respondent testified that Flores–Garcia was somewhat evasive regarding the facts surrounding his 1999 entry, but Respondent believed there were three possible grounds for arguing Flores–Garcia's entry had been lawful: (1) an officer had inspected him; (2) he provided information suggesting he might be eligible for a waiver under a family unification provision for special agricultural workers;[35] and (3) he had obtained from the Mexican consulate in Denver an identification card known as a matricula card, and Mexican nationals in 1999 arguably could cross the border without a visa or passport if they intended to obtain a matricula card.[36] Contrary to Respondent's

---

travel.state.gov/visa/immigrants/types/types_2991.html (last visited Dec. 19, 2011).

**26.** "A K–3 visa allows a beneficiary of an I–130 petition to enter the United States to await the availability of an immigrant visa." *Atunnise,* 523 F.3d at 832 (citing 8 U.S.C. § 1101(a)(15)(K)(ii)).

**27.** Department of State, *Nonimmigrant Visa for a Spouse (K–3),* http://travel.state.gov/visa/immigrants/types/types_2993.html (last visited Dec. 19, 2011).

**28.** 22 C.F.R. § 41.81(b)(2).

**29.** Department of State, *Immigrant Visa for a Spouse or Fiancé(e) of a U.S. Citizen.*

**30.** Consulate General of the United States, Ciudad Juarez, Mexico, *Form I–601—Application for a Waiver: Filing the Application,* http://ciudadjuarez.usconsulate.gov/hcis601.html (last visited Dec. 19, 2011).

**31.** *See* 8 U.S.C. § 1361 (placing burden of proof on alien to establish eligibility for visa or other document required for entry to the United States and to show he or she is not inadmissible).

**32.** *See* Consulate General of the United States, *Form I–601—Application for a Waiver.*

**33.** Between 1983 and 1997, Respondent practiced criminal law and oil and gas law.

**34.** Flores–Garcia also had two children living in Mexico. He speaks Spanish and knows little English, while Rivas is fluent in both English and Spanish.

**35.** *See* Ex. R. According to Respondent, Flores–Garcia said his father had applied for special agricultural worker status, in which case 8 U.S.C. § 1160(c)(2)(B)(i) could waive Flores–Garcia's inadmissibility.

**36.** *See* Ex. E. Respondent cites a former version of 22 C.F.R. § 41.1(g). While that rule was in effect, it provided that a Mexican national entering the United States in order to apply for an

testimony, Rivas claims Respondent never discussed with them the possibility of arguing Flores–Garcia's 1999 entry had been lawful.

At their initial meeting, Respondent recommended filing a request under the Freedom of Information Act ("FOIA") to determine if INS had any records of Flores–Garcia's entry into the United States that would affect his admissibility, such as an order of removal. Rivas and Flores–Garcia approved this course of action and paid Respondent $500.00 to file the FOIA request.[37] Respondent received a favorable response on December 3, 2003, indicating INS had no records concerning Flores–Garcia's entry into the United States.[38]

In late 2002 and early 2003, while awaiting the FOIA response, Respondent met with Rivas and Flores–Garcia a number of times. According to Respondent, he advised the couple that Flores–Garcia was presumptively subject to the waivable ten-year bar because he had stayed in the United States for over a year following his 1999 entry, but he would be eligible for a hardship waiver in the future if he and Rivas were engaged or married. The process Respondent outlined was for Flores–Garcia to file a visa petition, attend a visa interview at the U.S. consulate in Juarez, Mexico, and apply for an I–601 hardship waiver. Rivas's recollection of this advice is largely consonant with Respondent's testimony.

In early 2003, Flores–Garcia expressed a desire to visit his ailing mother in Mexico. Respondent and Evelyn McCormick (Respondent's wife and office manager) both testified that Respondent advised Flores–Garcia not to return to Mexico. Respondent avers

he also told Flores–Garcia that, should he travel to Mexico, he could not return to the United States until Rivas's divorce was finalized and he obtained a visa. Respondent testified that he warned Flores–Garcia not to re-enter the United States illegally, because doing so could trigger the non-waivable ten-year bar. In spite of Respondent's advice, Flores–Garcia elected to return to Mexico.

In December 2003, Rivas's divorce was finalized.[39] Early the next year, she told Respondent she wanted to travel to Mexico to marry Flores–Garcia.[40] Respondent explained that, if she did so, the couple would need to file an I–130, apply for a K–3 visa, and request a hardship waiver.[41]

Rivas married Flores–Garcia in Mexico in April 2004. She then returned to Colorado. Rivas entered into a fee agreement with Respondent on May 18, 2004, and paid him $1,500.00 to prepare and file a visa application and related forms.[42]

According to Respondent, he learned only in late May 2004, after signing the fee agreement, that Flores–Garcia had illegally re-entered the United States in September 2003 and again returned to Mexico in March 2004. Respondent asserts he discovered Flores–Garcia's 2003 re-entry when a notaria[43] sent him a biographic information sheet—one component of the I–130 application—which Rivas and Flores–Garcia had filled out and which listed Flores–Garcia's 1999 and 2003 entries into the United States.[44] Respondent suspects the notaria previously gave the couple incorrect advice about Flores–Garcia's eligibility for legal status and whether it was

official Mexican document at a Mexican consulate was not required to present a visa or passport when crossing the border. *See* Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended–Border Crossing Identification Cards, 63 Fed. Reg. 16892, 16893 (Apr. 7, 1998).

37. Exs. 1–3.

38. Ex. 4. Even though DHS had superseded INS on March 1, 2003, the FOIA response was written on INS letterhead.

39. Ex. 5.

40. *See* Ex. 6.

41. *See id.*

42. Ex. 9. Rivas also paid Respondent $935.00 for filing fees. Compl. ¶ 53; Answer ¶ 42. Respondent's records show he incurred charges for time he later spent on the I–601 hardship waiver, *see* Ex. 23, but it appears he never billed Rivas for that time.

43. "Notaria" is a term commonly used to refer to licensed notaries who assist the Mexican immigrant community.

44. Ex. 11.

wise for him to return to Mexico.[45]

Rivas presented a different story regarding the events described above. She initially testified that neither she nor Flores–Garcia told Respondent of Flores–Garcia's plan to return to Mexico, implying that Respondent never warned Flores–Garcia not to re-enter the United States illegally. However, Rivas subsequently conceded that Respondent did tell Flores–Garcia he should only return with legal documentation. Rivas also claimed that she informed Respondent soon after September 2003 of Flores–Garcia's illegal re-entry and that she filled out the biographic information sheet listing Flores–Garcia's 1999 and 2003 entries while in Respondent's office. According to Rivas, Respondent then advised her that he no longer believed filing for a fiancé visa was a viable strategy and she should instead file an I–130. Rivas also claims that Respondent told her it was preferable for Flores–Garcia to return to Mexico pending processing of his applications and that the couple decided to marry in Mexico rather than the United States on the basis of this advice.

Contrary to Rivas's testimony, Respondent testified that his assessment of Flores–Garcia's case shifted dramatically in May 2004, when he says he learned of the 2003 re-entry. Although he deemed this revelation to be quite damaging, he claims Rivas begged him to pursue any possible means of securing legal status for Flores–Garcia, even if success was unlikely.[46] Respondent researched the available options, including by consulting with two other immigration lawyers.

Respondent testified that he settled on a strategy with two elements. First, he developed a legal theory, which we refer to as the "I–601 strategy": that the consulate in Juarez was legally obligated to forward Flores–Garcia's I–601 hardship waiver application to USCIS for adjudication, even though Flores–Garcia's 1999 and 2003 entries were presumptively illegal and the consulate typically would refuse to accept an I–601 for an alien subject to the nonwaivable ten-year bar. Second, if Flores–Garcia obtained an interview for an immigrant visa, he could present evidence that his 1999 entry had been legal; if that argument prevailed, he would not be subject to either of the ten-year bars, since he had remained only briefly in the United States after his 2003 reentry.[47]

Respondent testified that he thoroughly discussed his legal strategies with Rivas in advance, he prepared her for the issues to be addressed at the consular interview, and she understood the odds were not in their favor. Respondent also claims he discussed these issues with Flores–Garcia after he returned to Mexico. At the disciplinary hearing, Rivas equivocated regarding her expectations for the interview, though she admitted Respondent told her there was no guarantee of success.

Respondent filed an I–130 in June 2004 and an I–129F the following month.[48] In August 2004, Respondent submitted to the U.S. embassy in Mexico City an expedited request for waiver of inadmissibility along with an I–601, arguing that Rivas was suffering emotional trauma due to her separation from Flores–Garcia and incurring great expense by visiting him in Mexico.[49]

Rivas's I–129F petition was approved in February 2005,[50] and the couple attended a May 2005 consular interview in Juarez regarding the K–3 visa application.[51] After the interview, the officer determined that Flores–Garcia was ineligible for the visa and

---

**45.** Answer ¶ 8.

**46.** Evelyn McCormick testified that Rivas was disappointed with Respondent's prognosis for Flores–Garcia's case and repeatedly called the office in hopes of receiving a different answer. She said that Rivas's frequent calls to Respondent were difficult for the office staff to handle and "borderline abusive."

**47.** Because Flores–Garcia had remained in the United States for less than 180 days after his 2003 re-entry, he also would not be subject to the three-year bar pursuant to 8 U.S.C. § 1182(a)(9)(B)(i)(I).

**48.** Exs. 10–11. The I129F is dated June 18, 2004, but Respondent recalls he filed it in July 2004.

**49.** Ex. 14; *see also* Exs. 17–18.

**50.** Ex. 16.

**51.** Ex. 19.

could not re-apply for ten years.[52] The officer did not accept or forward to USCIS Flores–Garcia's I–601 hardship waiver application.

After the consular interview, Respondent claims he explained the range of appellate options to Rivas. He testified that Rivas wanted to attend an immigrant visa interview scheduled for May 2006 rather than immediately filing an appeal. Rivas, meanwhile, flatly disputes that Respondent ever discussed an appeal with her.

To preserve their appeal rights, Respondent wrote to the consulate in late May 2005, maintaining that Flores–Garcia was entitled to a hardship waiver and that the consular officer had been legally obligated to accept Flores–Garcia's proffered I–601.[53] Respondent received a response from the consulate dated August 29, 2005, stating that Flores–Garcia was subject to the nonwaivable ten-year bar.[54] Respondent next wrote to Senator Kenneth Salazar in October 2005, arguing that Flores–Garcia should be eligible for a waiver.[55] The senator's office replied later that month, saying the senator had written to the consulate.[56] A consular officer responded to the senator's inquiry on November 1, 2005, reasserting that Flores–Garcia was ineligible for a visa.[57]

The People allege that Respondent did not share with Rivas copies of the correspondence from the consulate and the senator's office. Respondent, however, avers he mailed a copy of the letter he had received from the senator's office to the address Rivas had given him, but it was returned as undeliverable because she no longer lived there.

Respondent also testified that he sent Rivas a copy of the letter the consulate had mailed to the senator.

Rivas and Flores–Garcia ultimately elected not to attend the May 2006 interview for the I–130 petition, and Flores–Garcia never obtained approval of the I–130.[58] Also in 2006, Rivas told Respondent that Flores–Garcia had illegally re-entered the United States a third time and had been arrested for driving under the influence.[59] Because it had become a matter of public record that Flores–Garcia had unlawfully re-entered the United States, Respondent told Rivas he could do nothing more for the couple. As Respondent explained at the disciplinary hearing, in light of Flores–Garcia's criminal record, it was inconceivable that a consular officer would exercise discretion in Flores–Garcia's favor.

Rivas filed a grievance against Respondent in 2009. She claims she decided to do so based on advice she received from a volunteer lawyer at a Denver church in May 2009. The volunteer lawyer, who reviewed several documents in Rivas's possession, apparently told her that Flores–Garcia's 1999 and 2003 entries into the United States made him ineligible for legal status and that any contrary advice the couple might have previously received would have been incorrect.

Rivas and Flores–Garcia have divorced, though they continue to live together. At present, Flores–Garcia is awaiting a removal hearing scheduled for February 2012. The Hearing Board is unaware whether Flores–Garcia intends to raise a defense that Respondent provided ineffective assistance of counsel.[60]

52. Ex. 22.

53. Ex. 25.

54. Ex. 26.

55. Ex. 27. Respondent's letter asserts that Flores–Garcia is eligible for a waiver under "Section 601 of the INA." The Hearing Board assumes he meant a waiver to be filed using Form I–601, as there is no section 601 in the INA. The People observe that Respondent's letter to the senator's office does not fully explain his I–601 strategy, but Respondent testified that he discussed this issue in detail with an aide to the senator.

56. Ex. 28.

57. Ex. 29.

58. Compl. ¶ 52; Answer ¶ 41.

59. *See* Ex. G.

60. We note that under *Matter of Lozada*, 1988 WL 235454, 19 I. & N. Dec. 637, 639 (BIA 1988), an alien may only reopen removal proceedings based upon a claim of ineffective assistance of counsel if the former counsel has been informed of the allegations and has had an opportunity to respond. *See also Matter of Compean*, 25 I. & N. Dec. 1, 1–2 (A.G.2009) (reaffirming validity of

## Alleged Violations of Colo. RPC 1.1 and 1.3

■ We address the People's claims under Colo. RPC 1.1 and 1.3 together, since these claims arise out of the same fundamental assertion that Respondent provided incompetent representation. Colo. RPC 1.1 requires lawyers to competently represent their clients; competency entails the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation. Colo. RPC 1.3 obligates lawyers to act on their clients' behalf with reasonable diligence and promptness.

The crux of the People's argument with respect to both claims is that Respondent provided inaccurate legal advice to Rivas and Flores–Garcia because he did not undertake sufficient legal analysis to understand that Flores–Garcia was ineligible for legal residency. The People further argue that Respondent did not develop the I–601 strategy in 2004, as he claims. Rather, the People allege he devised this legal theory several months before the disciplinary hearing in an effort to mask his earlier incompetency.

To resolve the People's claims, we must address the contradictory nature of Respondent's and Rivas's testimony. Respondent's defense is premised upon his assertions that Rivas and Flores–Garcia hid from him the key fact of Flores–Garcia's 2003 illegal re-entry, that Rivas pleaded with him to try to help her husband, even if the odds of securing relief were quite low, that he fully advised Rivas about his proposed strategies, and that he did not charge Rivas for the time he spent advancing the I–601 strategy. Rivas, on the other hand, claimed she immediately informed Respondent of Flores–Garcia's 2003 re-entry, and her testimony conveyed a general belief that he did not fully advise her of the tenuous nature of the legal strategy he was pursuing.

We conclude that the inconsistencies in Respondent's and Rivas's testimony should be resolved in Respondent's favor. We gather from a broad range of testimony in this matter, as well as from the extensive evidence of Respondent's solicitude for Rivas and Flores–Garcia, that Respondent is a lawyer deeply committed to serving his clients and to fighting what he perceives to be the injustices inflicted by immigration law and policy. We find Rivas to be substantially less credible. She spoke with an unnaturally flat affect and in an often evasive, muddled, and almost dazed manner, in some instances asking for questions to be repeated numerous times. In addition, we are somewhat skeptical of Rivas's motivation for filing a grievance against Respondent. That she did not file her complaint until 2009 raises a question as to whether other motives gave rise to her grievance.

We also find it difficult to accept the People's assertion that Respondent did not grasp the concept of the non-waivable ten-year bar. Respondent testified that he had handled hundreds of immigration cases by the time he represented Rivas and Flores–Garcia and that the majority of his immigration cases have involved illegal entries into the United States. It is implausible that a lawyer as intellectually curious, experienced, and dedicated as Respondent would fail to understand a rudimentary principle of his area of legal practice.

However, we find it more challenging to determine whether Respondent's representation of Flores–Garcia after Respondent learned of the 2003 re-entry met the standards of competence expected of lawyers. Since Respondent testified that he relied in large part upon the I–601 strategy after learning of the re-entry, this strategy merits further explanation.

The practice of U.S. consulates, in accordance with the State Department's Foreign Affairs Manual ("FAM"), a non-binding guidance document, has been to decline to forward a K–3 visa applicant's I–601 waiver request to USCIS if the applicant appears to be ineligible for an immigrant visa.[61] FAM

---

*Lozada*). The filing of a disciplinary grievance may provide former counsel the requisite notice and opportunity to respond.

**61.** *See* 9 FAM 41.81 N9.1 ("A K visa is a nonimmigrant visa (NIV), and, therefore, K nonimmigrants are generally eligible for [8 U.S.C. § 1182(d)(3)(A)] waivers. However, processing an [8 U.S.C. § 1182(d)(3)(A)] waiver would not

also grants consular officers discretion to accept or reject a proffered I–601 application.[62]

Respondent's strategy was to challenge the consular practice of withholding waiver requests, relying on 8 C.F.R. § 212.7(9), a DHS regulation, which at the time stated: "An applicant for an immigrant visa or K nonimmigrant visa who is inadmissible and seeks a waiver of inadmissibility shall file an application on Form I–601 at the consular office considering the visa application. Upon determining that the alien is admissible except for the grounds for which a waiver is sought, the consular officer shall transmit the Form I–601 to the service for decision." [63] Respondent also relies on 8 U.S.C. § 1182(d)(3)(A), which provides that an alien who is inadmissible "but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General." [64] Respondent argues that Flores–Garcia was eligible for a waiver for a K–3 visa, which is a nonimmigrant visa,[65] so the consular officer had a legal duty to forward the waiver application to USCIS. Even if it appeared to the consular officer that Flores–Garcia's 1999 and 2003 entries made him subject to the non-waivable ten-year bar and thus ineligible for an immigrant visa, Respondent believes it was ultra vires for the officer to rule Flores–Garcia ineligible for an immigrant visa, since only a non-immigrant visa petition was before the officer.

If the consular officer had in fact forwarded Flores–Garcia's I–601 to USCIS and Flores–Garcia had received a waiver, Respondent claims Flores–Garcia would have benefitted by gaining the ability to argue in the United States—rather than in Juarez, where review is less favorable—that his 1999 entry had been lawful.[66] Respondent testified that if the consular officer refused to forward the I–601 application, as he expected, he planned to administratively appeal that decision. He had other clients in a similar position to that of Flores–Garcia who could join in such an appeal. If they succeeded in setting a new precedent for consular processing, Respondent believed many other immigrants would benefit.

---

be appropriate unless an immigrant waiver is also available when the K visa holder applies to adjust status to legal permanent resident. To determine whether a waiver is available for a K applicant, the consular officer must, therefore, first examine whether the particular [8 U.S.C. § 1182(a)] ineligibility is waiveable for immigrant spouses of U.S. citizens, under either [8 U.S.C. § 1182(g), (h), (i), (a)(9)(B)(v), (d)(11) or (12)] or similar provisions."); 9 FAM 41.81 N9.2 ("If the K visa applicant is ineligible for a visa on an [8 U.S.C. § 1182(a)] ground for which no immigrant waiver is or would be possible after marriage to the petitioner, then the case should not be recommended for an [8 U.S.C. § 1182(d)(3)(A)] waiver and no waiver request should be submitted to USCIS.").

62. *See* 9 FAM 40.301 N1 ("Congress, in enacting [8 U.S.C. § 1182(d)(3)(A)], conferred upon the Secretary of State and consular officers the important discretionary function of recommending waivers of nonimmigrant visa … ineligibilities to [DHS] for approval").

63. The Hearing Board was unable to independently review this language, so we rely on the transcription provided in Respondent's closing statement. Respondent asserts the regulation was amended from that form in 2007. The current parallel regulation, 8 C.F.R. § 212.7(a)(1), provides: "Any alien who is inadmissible under [8 U.S.C. § 1182(g), (h), or (i) ] who is eligible for a waiver of such inadmissibility may file on the form designated by USCIS.… When filed at the consular section of an embassy or consulate, the Department of State will forward the application to USCIS for a decision after the consular official concludes that the alien is otherwise admissible." The sections of the INA cited in 8 C.F.R. § 212.7(a)(1) pertain to inadmissibility on grounds relating to health, criminal activity, and fraud, so the revised regulation does not directly pertain to the ten-year bars on admissibility.

64. The only exception to this provision applies to aliens who are inadmissible on national security grounds. 8 U.S.C. § 1182(d)(3)(A).

65. *See, e.g., Atunnise*, 523 F.3d at 834 (noting that the Board of Immigration Appeals (the appellate body designated to review immigration court decisions) has taken the position that a "K–3 visa is unambiguously a nonimmigrant visa").

66. Respondent testified that another advantage to recommending Flores–Garcia proceed to a K–3 interview despite his two entries into the United States is that FOIA requests do not capture consular records. Any consular record of removal orders for Flores–Garcia would come to light at the K–3 interview, and the lack of such records would bolster his claim of prior lawful entry.

In contrast to Respondent's view, the People's witness Nancy Elkind ("Elkind"), who the PDJ accepted as an expert on immigration law, testified that the I–601 strategy lacked merit. Although DHS regulations direct consular officers to forward proffered I–601 s to USCIS, Elkind noted that consulates must adhere to FAM, which authorizes consular officers to reject a waiver application filed by a K–3 applicant who appears to be ineligible for an immigrant visa. Elkind also testified that, assuming Flores–Garcia was subject to the non-waivable ten-year bar, he would gain no benefit from the consulate forwarding his waiver application to USCIS because USCIS would not grant him a waiver.

On the other hand, the testimony of Lourdes Rodriguez ("Rodriguez"), an immigration lawyer who both refers cases to Respondent and receives referrals from him, supported the validity of Respondent's approach.[67] In her view, it is a matter of due diligence to press consular officers to accept I–601 applications filed by applicants for nonimmigrant visas. Rodriguez shares Respondent's view that consular officers are legally required to forward I–601 s proffered by K–3 visa applicants to USCIS. She also stated that, while it may take several years to challenge a consular officer's failure to forward an I–601, eventually the consulate will in fact forward I–601 s to USCIS. In addition, Rodriguez testified that upon receiving a K–3 visa and waiver, a foreign national may seek adjudication of his or her case in the United States and generally may travel back and forth to his or her country of origin during that period.

It is challenging for us to reconcile the testimony provided by Respondent, Elkind, and Rodriguez concerning the I–601 strategy. Part of the difficulty lies in the fact that their testimony appears to have been grounded in different assumptions regarding the nature of the legal advice Respondent provided and whether there were any grounds for arguing Flores–Garcia was not

subject to the non-waivable ten-year bar. On the whole, we credit Elkind's view that Respondent's I–601 strategy was unlikely to secure relief for Flores–Garcia in light of consular policy and practice. Yet we also conclude there was a valid legal basis for the I–601 strategy, and we believe a lawyer could pursue this strategy in good faith.

The People further claim that, even if the I–601 strategy might have theoretical legal merit, Respondent actually devised this strategy only several months before the disciplinary hearing to rationalize his earlier incompetent legal advice. The People emphasize that Respondent's answer and amended answer do not spell out the I–601 strategy. They note, for instance, that Respondent's answer concedes the I–601 waiver was not available to Flores–Garcia because of the non-waivable ten-year bar.[68] Respondent, on the other hand, points to a note citing 8 C.F.R. § 212.7(9) in his original client file as evidence that he formulated the I–601 strategy during the representation.[69] In addition, he stresses that he offered the legal advice in question approximately five years before this disciplinary proceeding and has since represented hundreds of other clients; as a result, he claims he had forgotten the details of this representation. Respondent also testified that his client file was in the possession of his former counsel when he first responded to the People's complaint, and it was only upon a detailed review of the file that he recalled the strategy he had pursued.

The Hearing Board is troubled by the inconsistencies in Respondent's representations about his legal strategy, and it appears possible that he did not originally rely on the I–601 strategy as heavily as he now suggests. But this does not mean he acted incompetently. The I–601 strategy was not the sole course of action Respondent took on his clients' behalf. In addition to laying the foundation for an appeal, which could have

---

67. Respondent did not offer Rodriguez as an expert in immigration law, but she testified that she has represented clients in approximately 300 consular processing cases, most of which involved the U.S. consulate in Juarez.

68. Compl. ¶¶ 25, 27; Answer ¶¶ 23–24.

69. Ex. A.

been grounded on several legal theories,[70] Respondent's efforts included discussing the matter with Senator Salazar's office and positioning Flores–Garcia to benefit from any possible amnesty program. Respondent testified that there was a possibility Congress would grant amnesty to persons with an approved I–130; in fact, he notes that an amnesty bill was pending before Congress in 2004, though it did not pass. He also planned to ask Senator Salazar to introduce a private bill for the benefit of Flores–Garcia and to raise the matter with the congressional ombudsperson. Finally, simply by assisting Rivas and Flores–Garcia with the I–130, Respondent provided his clients a service of some value, as Elkind acknowledged. Had Flores–Garcia and Rivas completed that application process, as Respondent advised, and remained married, the approved I–130 would have remained valid for Flores–Garcia's future use.

We wish to stress that the legal strategy Respondent undertook would not be appropriate under all circumstances. Not all clients want their lawyers to pursue legal strategies that have a low probability of yielding relief. But here, Respondent avers he told his clients that Flores–Garcia likely would be inadmissible for ten years and he continued the representation because Rivas pled with him to do anything possible to help her husband. Another significant circumstance here is that Respondent performed much of his legal work without compensation.[71]

Most important, we must not quell the crusading spirit of lawyers like Respondent who attempt to rectify injustices they perceive in our legal system. Legal challenges to ingrained assumptions and entrenched practices may initially appear foolhardy, yet ultimately bring about valuable changes in the law. As recognized in comments 1 and 2 to Colo. RPC 3.1, lawyers should account for "the law's ambiguities and potential for change," and good-faith arguments are not frivolous merely because the lawyer "believes the client's position ultimately will not prevail." [72]

In sum, we cannot accept the People's argument that Respondent misunderstood the legal framework governing Flores–Garcia's case and provided incompetent advice as a result. Rather, we believe Respondent understood the legal hurdles standing in his clients' way but pressed forward with several uncertain legal theories in the face of Rivas's repeated entreaties that he pursue all legal options. In our view, Respondent advanced his legal strategies with both a good-faith basis and his client's informed consent. Accordingly, we find the People have not proved a violation of Colo. RPC 1.1 or 1.3 by clear and convincing evidence.

### Alleged Violations of Colo. RPC 1.4(a)

 The People allege Respondent failed to adequately communicate with Rivas in violation of Colo. RPC 1.4(a), which requires a lawyer to keep a client reasonably informed about the status of a matter. The People's claim rests on the assertion that Respondent never gave Rivas a copy of the letter from the consulate to Senator Salazar's office or a copy of the letter from the senator's office to Respondent. The People point both to Rivas's testimony that she never saw the let-

---

**70.** The Hearing Board recognizes that administrative and judicial review of consular decisions is limited. *See, e.g., Saavedra Bruno v. Albright,* 197 F.3d 1153, 1156, 1159–60 (D.C.Cir.1999) (noting that consular denials of visa applications are generally nonreviewable) (citing 8 U.S.C. §§ 1104(a), 1201(a)). But not all appeals of consular practices are futile. *See, e.g., Patel v. Reno,* 134 F.3d 929, 932–33 (9th Cir.1997) (finding jurisdiction to consider a claim concerning a consulate's authority to suspend visa applications).

**71.** Respondent testified that he did not charge Rivas for time he spent working on the I–601 strategy. Rodriguez's and Elkind's testimony in-

dicated that Respondent's legal fee was reasonable, particularly given the frequent nature of his meetings with Rivas.

**72.** Some authorities suggest that legal challenges to existing practices are particularly appropriate in the immigration context. *See* Andrew T. Chan and Robert A. Free, *The Lawyer's Role in Consular Visa Refusals,* IMMIGRATION BRIEFINGS (Apr. 2008) (opining that in the consular process, lawyers should be "very ·persistent," "use the opportunities that do exist to present visa applications and to obtain limited review of visa denials," and "press for legislation that at least creates an opportunity for administrative review of visa denials").

ters in question and to Respondent's failure to present documentary evidence demonstrating that he had shown the letters to Rivas.

But the People, not Respondent, bear the burden of establishing that misconduct occurred. Given our assessment of the relative credibility of Respondent and Rivas, we are inclined to believe Respondent's testimony that he mailed copies of the letters to Rivas. Respondent's averments are consonant with other evidence of his conscientious communication efforts, including Rivas's own testimony that Respondent was available to talk to her whenever she needed and that he reviewed with her the statutes governing Flores–Garcia's admissibility. Thus, we do not find by clear and convincing evidence that Respondent violated Colo. RPC 1.4(a).

## IV. CONCLUSION AND ORDER

We conclude the People have failed to demonstrate clearly and convincingly that Respondent engaged in any misconduct, and we accordingly **DISMISS** their complaint.

