# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-3773

IRGEN COMOLLARI,

*Petitioner,*

v.

JOHN D. ASHCROFT,

*Respondent.*

_____

On Petition to Review an Order of
the Board of Immigration Appeals.
No. A 77 658 062.

_____

ARGUED JULY 6, 2004—DECIDED AUGUST 10, 2004

_____

Before POSNER, EASTERBROOK, and KANNE, *Circuit Judges.*

POSNER, *Circuit Judge.* Comollari, an Albanian, challenges
an order issued by an immigration judge and affirmed with-
out opinion by the Board of Immigration Appeals removing
(deporting) him to Albania. He claims that the order vio-
lates Article 3 of the Convention Against Torture and Other
Cruel, Inhuman or Degrading Treatment or Punishment,
1465 U.N.T.S. 85 (1984), which the United States has signed.
Article 3 of the Convention, incorporated into federal law by
section 2242(a) of the Foreign Affairs Reform and Restruc-
turing Act of 1988, 8 U.S.C. § 1231, forbids expelling a
person to "a country in which there are substantial grounds

for believing the person would be in danger of being sub-jected to torture." An implementing regulation defines "sub-stantial grounds for believing the person would be in dan-ger of being subjected to torture" to mean that he "is more likely than not to be tortured in the country of removal." 8 C.F.R. § 208.16(c)(4); see *Khouzam v. Ashcroft*, 361 F.3d 161, 168 (2d Cir. 2004); Deborah E. Anker, *Law of Asylum in the United States* 510-11 (3d ed. 1999). The regulation defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person," by or with the acquiescence of an official, for various purposes, including punishment, § 208.18(a)(1); see, e.g., *Pelinkovic v. Ashcroft*, 366 F.3d 532, 541 (7th Cir. 2004), provided that the person is "in the offender's custody or physical control." § 208.I8(a)(6); *Azanor v. Ashcroft*, 364 F.3d 1013, 1019 (9th Cir. 2004).

Between 1997 and 1999 Comollari worked in Albania as a bodyguard for leaders of the Albanian Socialist Party, the party in power in Albania. The bodyguards doubled as guards on trucks smuggling cigarettes and coffee for the enrichment of the party's bosses. The guards complained that the smuggling had become too dangerous. In 2000, after three of them were killed—one after threatening to reveal the party's involvement in smuggling—and Comollari himself was repeatedly threatened with death, he fled to the United States. The leader of Albania's Democratic Party had publicly promised that if his party were returned to power he would see to it that the Socialist leaders were prosecuted for corruption. Comollari figured that those leaders wanted to kill the guards in order to prevent them from testifying in a corruption inquiry.

The immigration judge found Comollari's testimony at his asylum hearing wholly credible: "the respondent's tes-timony, as well as his written statement, will be fully cre-

dited on all material facts as they relate to this claim." But he concluded that the danger facing Comollari should he be returned to Albania came from members of the Socialist Party rather than from the government of Albania and therefore the requisite acquiescence of an official was missing. The judge was influenced in (probably driven to) this conclusion by his belief that the Democratic Party had wrested the governing power from the Socialist Party in 1999 and that Comollari, in addition to fearing reprisals by Socialists, feared prosecution by the government for his participation in smuggling. The immigration judge said that in 1999 "the political party then in power changed to the Democratic Party" and that Comollari "had information which was being sought by the Democratic Party to prosecute individuals within the Socialist Party for corruption." Comollari "acted with impunity until 1999, when the Democratic Party came to power."

The immigration judge was wrong. The Democratic Party did not come to power in 1999. It has been out of power since 1997. As noted in previous cases, *Bace v. Ashcroft*, 352 F.3d 1133, 1135 (7th Cir. 2003); *Hasalla v. Ashcroft*, 367 F.3d 799, 801-02 (8th Cir. 2004), the Socialists still rule the roost. U.S. Department of State, "Background Note: Albania" (July 2004), http://www.state.gov/r/pa/ei/bgn/3235.htm; "World in Brief," *Wash. Post*, Dec. 15, 2003, p. A27. Comollari so testified without contradiction. Not being the governing party, the Democratic Party could not cause the leaders of the Socialist Party to be prosecuted, or, to be more precise, could not remove whatever impediments to prosecution the Socialists as the ruling party had been able to create for their protection. The Justice Department contends that, even so, the threat to kill Comollari comes from Socialists acting in a private rather than in an official capacity. Of course, this would be a judgment for the immigration judge to make, not us. As we tirelessly remind the lawyers from the Justice

Department's Office of Immigration Litigation, see, e.g., *Mengistu v. Ashcroft*, 355 F.3d 1044, 1046-47 (7th Cir. 2004); *Albathani v. INS*, 318 F.3d 365, 378 (1st Cir. 2003), the *Chenery* rule bars a reviewing court from upholding an agency's decision on a ground different from the agency's. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285-86 (1974).

The immigration judge thought that since the Socialists were not in power there could not be official acquiescence in their efforts to wipe out the very witnesses that the government wanted for its inquiry into Socialist corruption. "He is being sought by members of the Socialist Party, not by the government of Albania. It is clear that the respondent has failed to establish it is more likely than not that the government of Albania would treat him in cruel or an inhumane manner should he be returned to that country." The judge's reasoning collapses with the premise that the Socialists had been displaced by the Democrats. We doubt that an immigration judge would suppose that when a government official caused someone to be killed in order to conceal the corrupt activities of his, the ruling, party, the official was acting in a purely private capacity. Cf. *Khouzam v. Ashcroft, supra*, 361 F.3d at 171. But, however that may be, it was not the immigration judge's rationale.

The government's lawyer argued for the first time on appeal that assassination is not torture. She pointed out that one element of the definition of torture, quoted at the outset of this opinion, is the infliction of "severe pain or suffering, whether physical or mental" and that there is such a thing as a painless death. The relevance of the argument to this case is difficult to grasp. There is no indication that Albanian assassins are committed to a "clean kill" philosophy. Even if death itself is painless, moreover, the anticipation of it can be a source of acute mental anguish; if the threat of

imminent albeit painless death were deliberately employed to cause such anguish, it would be a form of torture. See 8 C.F.R. § 208.18(a)(4)(iii); Anker, *supra*, at 493-97.

Nor is it obvious that "suffering" must always be conscious; consider the old practice of mutilating a criminal's body after his death. Pieter Spierenburg, "The Body and the State: Early Modern Europe," in *The Oxford History of the Prison* 49, 54 (Norval Morris & David J. Rothman eds. 1995). It is true that tort law confines the category of "pain and suffering" to conscious pain and suffering, but that is because damages are awarded separately for tortiously inflicted death, even when painless. We needn't pursue the issue, which the immigration judge did not reach and the literature on the Convention Against Torture does not, so far as we have been able to discover, address. We note, however, that the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), codified at 28 U.S.C. § 1350 (note), establishes a civil damages action for torture victims including victims of extrajudicial killings (i.e., not pursuant to lawful death sentence). See *Flores v. Southern Peru Copper Corp.*, 343 F.3d 140, 152-53 (2d Cir. 2003); *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1286 (11th Cir. 2002); *Hilao v. Estate of Marcos*, 103 F.3d 767, 778-79 (9th Cir. 1996).

Nor need we pursue another issue—whether the victim of an Albanian assassin is likely to be "in the offender's custody or physical control," which is also part of the definition of torture. Probably more often that not the victim of a murderer is within the murderer's physical control for at least a short time before the actual killing, but that would not be true if for example the murderer were a sniper or a car bomber. This is another issue to be sorted out on remand.

There are still other issues that the immigration judge did not address and that must be resolved before Comollari can

prevail under the torture convention. One, which the government does argue in its brief—but which seems frivolous—is whether Comollari can be removed to a part of Albania in which he will be safe; if so, he is not entitled to relief. 8 C.F.R. § 208.16(c)(3)(ii); see *Singh v. Ashcroft*, 351 F.3d 435, 443 (9th Cir. 2003). The evidence the government points to—that Comollari was able to hide out at his aunt's home for a few weeks before leaving Albania—is feeble. The Socialist Party controls the Albanian government; there is no part of Albania to which its writ does not run, and living as a fugitive is not what safe relocation implies.

Slightly weightier is the government's argument that Comollari's smuggling activities in Albania amounted to serious nonpolitical crime, another defense to a claim under the Convention Against Torture. INA § 241(b)(3)(B)(iii), 8 U.S.C. § 1231(b)(3)(B)(iii); 8 C.F.R. § 208.16(d)(2); Nadia Yakoob, "Political Offender or Serious Criminal? Challenging the Interpretation of 'Serious, Nonpolitical Crimes' in *INS v. Aguirre-Aguirre*," 14 *Geo. Immigr. L.J.* 545 (2000). The determination of what is a serious nonpolitical crime is made by the Attorney General and is given *Chevron* deference. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999); *Chay-Velazquez v. Ashcroft*, 367 F.3d 751, 755 (8th Cir. 2004). In a normal country, smuggling might well be regarded as a serious crime, but in disordered states like Albania it may be little more than *malum prohibitum*.

There is a deeper objection to the government's "serious nonpolitical crime" defense. Comollari is not "wanted" by the Albanian government for smuggling or any other crime. The Socialist Party, which controls the government, was Comollari's principal in the smuggling operation. It "wants" him so that it can silence a whistleblower—a motive remote from the purpose of the exception to the torture convention for nonpolitical crime. There is also a question whether

smuggling on behalf of a political party is a nonpolitical crime. See generally Anurima Bhargava, "Defining Political Crimes: A Case Study of the South African Truth and Reconciliation Commission," 102 *Colum. L. Rev.* 1304 (2002). All these are matters for exploration on remand.

The petition for review is granted and the order of removal set aside.

A true Copy:

       Teste:

                          _____

                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*