In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-1800, 12-2877

ELENA SMYKIENE,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent*.

Petitions to Review Orders of
the Board of Immigration Appeals.
No. A075-006-826.

ARGUED JANUARY 18, 2013—DECIDED FEBRUARY 13, 2013

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. Elena Smykiene asks us to set aside the order of the Board of Immigration Appeals affirming an immigration judge's order that she be removed to Lithuania, and the Board's subsequent order denying her petition to reconsider its previous one. (We won't have to discuss the second petition, which challenges the denial of reconsideration and which we hereby

dismiss as moot.) Her petition for review presents questions concerning orders of removal *in absentia*.

A Lithuanian national, Smykiene entered the United States in 1995 on a visitor's visa. It expired in six months but she remained. Six months after it expired, in April 1996, she was arrested by U.S. Border Patrol officers in upstate New York. She was not jailed, but the arresting officers gave her an order to show cause why she should not be deported and also told her to provide them with her address. She gave them the following address: "4711 St. Joseph Creek Rd., Lisle, IL 60532 ('Lisle Condo')." She says this was an apartment house owned or leased by her employer and that she lived there with five other Eastern European women, all of whom, like her, worked as maids. The immigration judge conducted no evidentiary hearing, so the validity of these contentions has not been determined.

On July 22, 1996, the Immigration Court sent by certified mail to the address that Smykiene had given the Border Patrol a notice (called "notice to appear") that her hearing before the court would be held on December 11. The Postal Service returned the mail to the sender with the notation "Attempted—Not Known," which means that delivery was attempted but that the addressee was not known at the address to which the letter was delivered. There was no follow-up. December 11 came, Smykiene did not appear, and the immigration judge ordered her deported. (What is now called "removing" was then called "deporting"; in the rest of this opinion we'll use the current term.)

She says that a year later she married a man who, two years after that, became a naturalized U.S. citizen. So matters stood until November 23, 2010, when immigration officers showed up at her home (she was still living in DuPage County, where Lisle is located, but no longer in Lisle) and told her about the 14-year-old order of removal. A lawyer hired by her filed a motion to reopen the removal proceeding and rescind the removal order on the ground that his client had never received the notice of the removal hearing. The lawyer attached an affidavit in which Smykiene swore that she had not received the notice and that at the time she was handed the order to show cause she couldn't understand English. The affidavit, together with the notice that the Postal Service returned, is the only actual evidence in the case; we print her affidavit as an appendix to this opinion.

We set to one side issues of prosecutorial discretion—they are not our business, though we can't forbear to express our puzzlement that the government should be trying to remove a woman who for all they know is married to an American citizen and has lived in this country for 17 years without incident.

An alien cannot be ordered removed from the United States without notice and an opportunity to be heard. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent"). The alien can waive his right to a removal hearing; he does so if

having received notice of the hearing he decides to skip it; and in that case he can be ordered removed without a hearing—that is, ordered "*in absentia*" to be removed. *Sabir v. Gonzales*, 421 F.3d 456, 458 (7th Cir. 2005). But if he never received the notice, there is no waiver and so he is entitled to reopen the removal proceeding to enable him to contest removal. *Id*. at 458-59. An order of removal *in absentia* "may be rescinded…upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) . . . of section 1229(a)." 8 U.S.C. § 1229a(b)(5)(C)(ii). Section 1229(a)(1) provides that "written notice . . . shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien)."

As explained in *Joshi v. Ashcroft*, 389 F.3d 732, 736 (7th Cir. 2004), "the fact that the intended recipient did not actually receive notice does not contradict evidence that delivery was attempted and the notice requirement thus satisfied. But when as in this case the issue is not notice but receipt, because the statute allows an alien ordered removed in an absentia proceeding to reopen the proceeding if he did not receive notice even if the notice that was sent, whether or not it was received, satisfied statutory and constitutional require-ments, the intended recipient's affidavit of nonreceipt is evidence."

In denying Smykiene's motion to reopen, the immigra-tion judge confused notice with receipt, as well as over-looking our statement in *Joshi* that an affidavit of nonreceipt is evidence of nonreceipt. He said that

Smykiene had been "properly…notified of her hearing," since the address on the letter returned to sender was the address she'd given the arresting officer, and that instead of showing up at the hearing she had "waited over 14 years before filing a motion to reopen, and did so only after she was arrested . . . and notified she would have to report for deportation." A person is not "notified" if though notice was sent, it was not received. If Smykiene did not receive the notice she wouldn't have realized that she'd been ordered removed and so had better move to reopen. In this court the government *acknowledges* that she didn't receive the notice.

The immigration judge, in support of his rebuke to her for "wait[ing] over 14 years before filing a motion to reopen," added that she'd "presumptively received" if not the notice then the actual order of removal, because it had been mailed to her. But if she didn't receive the notice of the hearing, why would she be expected to have received a subsequent mailing to the same address? (We don't know what happened to that second letter.)

The immigration judge pointed out that an alien "cannot avoid notice by refusing to accept the notice or by providing an address at which she does not reside." And that is true; the alien who evades notice can't reopen the removal hearing. *Peralta-Cabrera v. Gonzales*, 501 F.3d 837, 843-44 (7th Cir. 2007); *Sabir v. Gonzales, supra*, 421 F.3d at 459; *Sanchez v. Holder*, 627 F.3d 226, 233-34 (6th Cir. 2010). But there is no evidence that Smykiene refused to accept the certified letter notifying her of the

removal hearing; had she refused, the Postal Service would if it followed its customary procedures have stamped "Refused" on it rather than "Attempted—Not Known." Nor is there evidence that she hadn't given the arresting officers her actual address (though later we'll see there's a question of the accuracy of the address she gave) or had otherwise attempted to evade the notice of hearing. Indeed no evidence concerning receipt was presented besides the returned letter and her affidavit, as there was no evidentiary hearing on her motion to reopen.

Smykiene concedes that proper notice was sent; the government agrees that it was not received; so the only question is whether she evaded receipt. Once nonreceipt is attested in an affidavit and there is no conclusive evidence of evasion, the alien is entitled to an evidentiary hearing. *Dakaj v. Holder*, 580 F.3d 479, 482-83 (7th Cir. 2009) (per curiam); *Joshi v. Ashcroft*, *supra*, 389 F.3d at 735; *Kozak v. Gonzales*, 502 F.3d 34, 37-38 (1st Cir. 2007); *Nibagwire v. Gonzales*, 450 F.3d 153, 157-58 (4th Cir. 2006); *Ghounem v. Ashcroft*, 378 F.3d 740, 744-45 (8th Cir. 2004); *Salta v. INS*, 314 F.3d 1076, 1079-80 (9th Cir. 2002). We needn't decide who has the burden of persuasion if an issue of evasion is raised in the evidentiary hearing. The Board said in *In re Grijalva*, 21 I&N Dec. 27, 37 (BIA 1995), that given the "presumption of effective service" (that is, that mail is usually delivered), the alien "must present substantial and probative evidence such as documentary evidence from the Postal Service, third party affidavits, or other similar evidence demonstrating that there was improper delivery or that

nondelivery was not due to the respondent's failure to provide an address where he could receive mail." But this standard, which substitutes a failure, even if completely innocent, to provide a correct address for evasion (in the sense of an intentional or reckless avoidance of receipt) as a ground for waiver of the right to a hearing, is not alluded to in the Board's or immigration judge's opinions in the present case; and anyway Smykiene hasn't been given a hearing at which to present evidence that might meet the standard of the *Grijalva* case.

The confusion evident in the immigration judge's opinion carried over to the Board's decision affirming him. The Board said that "in light of the documentary evidence in the record that the NOH [Notice of Hearing] was sent by certified mail through the U.S. Postal Service and there is proof of attempted delivery and notification of certified mail to the respondent, we agree with the Immigration Judge that the respondent received proper notice of the hearing. Therefore, the respondent has failed to overcome the strong presumption of effective service." In saying this the Board repeated the immigration judge's elementary mistake of confusing notice with receipt. Mail is sometimes misdelivered. Nothing is known for certain about the living arrangements in the condo in Lisle, although Smykiene asserts, thus far without contradiction, that several Eastern European maids were living there, she among them. Their English may have been atrocious. They may have been illiterate in English. They may all have been living in the same apartment and Smykiene's

name may not have been on the list of residents posted (one assumes) at the condo's entrance. It wouldn't be surprising in these circumstances that she hadn't received a letter addressed to her.

In parentheses the Board states that an immigration judge "may rescind an order of removal entered in absentia if the alien demonstrates that *without her own fault* she did not receive notice of her removal hearing" (emphasis in original). This is offered as a paraphrase of our holding in the *Sabir* case, which we cited earlier. It is an inaccurate paraphrase. The opinion in *Sabir*, after noting that "it is undisputed that Sabir did not receive the notice of his hearing—the record shows that it was returned to the immigration court marked 'Attempted-Not Known,'" asks: "what if, as the IJ speculated, it was Sabir's own fault that the notice was not delivered?" *Sabir v. Gonzales*, *supra*, 421 F.3d at 459. The speculation was "that Sabir thwarted delivery of the notice by changing the name on his mailbox." *Id*. We noted that the change had not been described and that anyway the Postal Service considers the name on a customer's mailbox irrelevant to delivery. And so the immigration judge had "erred in denying Sabir's motion to reopen in the face of conclusive proof that Sabir did not receive the notice." *Id*. The opinion does not place the burden of negating evasion on the alien, as the Board in the present case interpreted it to do.

The Board also faulted Smykiene for having failed to notify the Immigration Court of her change or changes of address, as required to do so by the order to show

cause. But there is no evidence that she changed addresses during the relevant time.

We note one more garble in the Board's opinion—another misleading parenthetical description of a holding, this one a holding in its *Grijalva* decision cited earlier. The parenthetical states: "a hearing notice which is sent by certified mail to the alien's last known address is sufficient to establish by clear, unequivocal, and convincing evidence that the alien *received* notice of the deportation hearing." (emphasis added). That is not what the Board said in *Grijalva*. It said that mailing notice to the alien's last known address meets the statutory requirement of *providing* notice; it clearly and correctly distinguished between notice and receipt of notice. *In re Grijalva*, *supra*, 21 I&N Dec. at 34, 36. We don't understand how the Board could have missed this fundamental distinction in the present case.

Compounding confusion gratuitously, Smykiene's opening brief asserts that she accidentally failed to give the Border Patrol officers her full address. She left out the last four digits of the nine-digit zip code and the number of her apartment. The first error would have been inconsequential, but the second would have increased the probability that she would not receive the notice. It is odd that her lawyer would assert that his client had given the Border Patrol an incomplete address, for that would suggest that the misdelivery of the notice of hearing was her fault after all; and indeed the Justice Department's lawyer pounces on the assertion to support the argument that it was indeed her

fault. But this is to use "fault" in a lay rather than legal sense. The government cites no authority for the proposition that an innocent mistake, especially of the kind likely to be made by a newcomer to the United States from a non-English-speaking country, forfeits the right to reopen an order of removal *in absentia*. Suppose Smykiene didn't understand the order to show cause, and knew only that she had to give the officers her address. Suppose in doing so she didn't realize that her apartment number was part of the address, or that in her anxiety she simply forgot to include it. Suppose when she didn't receive any communication from the government after her arrest she assumed that the government had decided not to bother with her; arrests often don't lead to prosecutions. If these are the circumstances—they are consistent with and to a degree supported by her affidavit—we doubt that the Board would enforce the *in absentia* removal order, for it is a grave matter to eject a person from the United States without giving her an opportunity to show that she should be allowed to remain, for example because she has married an American citizen. Anyway an appellate brief is not the place to allege new adjudicative facts, as Smykiene's lawyer pointlessly did.

Whatever standard Smykiene must meet to reopen her case, she has been given no opportunity to meet it, and so the Board's order must be set aside.

In closing we note our dissatisfaction with the Justice Department's advocacy in this case. Its brief states that Smykiene "needed to at least minimally try to explain

the unsuccessful delivery of her hearing notice, perhaps by providing some direct or circumstantial evidence that the address she gave to INS agents in April 1996 was correct and was still the address at which she could be reached in July 1996 when the hearing notice was mailed to her." We'll forgive the cumbrously split infinitive but not that when we pointed out at the oral argument that Smykiene was given no opportunity to explain anything, the Justice Department's lawyer switched gears and argued that to contest an *in absentia* order of removal the alien must plead that she did not receive the notice to appear, that she was still at the address to which the notice was mailed, and that she was not trying to thwart delivery, as by giving a false address or simply not opening mail that she knew to be from the Immigration Court (which she might not know, if indeed she was illiterate in English). But failure to plead these things was not the ground of the Board's decision and has, so far as we have we been told, no basis in the Board's case law. So once again the Justice Department in defending the Board of Immigration Appeals in a court of appeals has violated the *Chenery* doctrine. See, e.g., *Sarhan v. Holder*, 658 F.3d 649, 661 (7th Cir. 2011); *Atunnise v. Mukasey*, 523 F.3d 830, 838 (7th Cir. 2008); *Comollari v. Ashcroft*, 378 F.3d 694, 696 (7th Cir. 2004); *Carpio v. Holder*, 592 F.3d 1091, 1096 (10th Cir. 2010).

The petition for review is granted and the matter returned to the Board for further proceedings.

### APPENDIX: ELENA SMYKIENE'S AFFIDAVIT

I, Elena Smykiene, do hereby swear and affirm the following:

1. On April 20, 1996, I was sleeping in a room in the Budgetel Hotel, in Plattsburgh, New York.

2. At about 6:00 in the morning, I was awakened by a terrible knock on the door. I didn't know what was happening. I thought maybe it there was a fire.

3. When I opened the door, I saw a tall, white blue eyed man standing there. He said something, but I could not understand him. I do remember him saying "Immigration". I did not speak or understand English at that time. I spoke only Lithuanian, Polish, Russian, and Ukrainian. It turned out that he was an immigration officer. He spoke very angrily. I understood that something was wrong. He said something else which I did not understand. Finally, he gestured with his hand, and I realized he wanted me to go with him.

4. We took the elevator to the lobby. There I saw several other Lithuanians, and two other immigration officers.

5. The immigration officers were saying something, but I did not understand them. Finally one of the Lithuanians who understood some English said that we had to show our documents, and if we did not we would go to jail.

6. I went to my room escorted by the angry man. I gave him my passport and social security card. He said something else, which I did not understand. We went back to the lobby, and the officers said something else. The Lithua-

nian man who knew a little English, explained that we had to go the Immigration office.

7. I was driven to the Immigration office. There, they put us all in a separate room.

8. An officer came and starting taking our pictures and fingerprints, like we were criminals. When my turn came, the same angry man called my name. He told me to take a seat next to him. He copied something down from my passport. He asked me something very angrily, but I did not understand him. I was very afraid. He showed me the place where I had to sign. I signed but did not know or understand what I was signing. There were two other officers that I saw. None of the officers spoke to me in a language that I could understand.

9. That same day I called an acquaintance in Chicago. A Lithuanian man helped me buy a bus ticket to Chicago. My acquaintance met me at the bus station in Chicago.

10. I did not receive a notice from the Immigration Court telling me to court to court. I was not told what would happen if I did not go to Court.

11. When I came to Chicago, I got sick and depressed, because the incident frightened me very much. Even now after so many years passing, I cannot forget what happened to me that day in 1996. I was so very frightened.

12. Immigration officers recently came to my home, and told me that I have to report to their office on January 11, 2011.