In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2563

QIU YUN CHEN,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent*.

Petition to Review Order of
the Board of Immigration Appeals.
No. A097-979-909.

ARGUED MARCH 5, 2013—DECIDED MAY 9, 2013

Before POSNER, KANNE, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. The petitioner, a Chinese citizen, is the mother of two children (both boys) born to her in the United States. She seeks asylum on the ground that she is likely to be forcibly sterilized if she returns to China. Like most seekers of asylum on that ground she is from Fujian Province and will be returned there if denied asylum. The immigration judge, seconded by the Board of Immigration Appeals, denied her applica-

tion on the ground that she has no well-founded fear of sterilization. The immigration judge also found that she could relocate to a part of China in which the one-child policy is not enforced as enthusiastically as it appears to be in Fujian, but the Board ignored that issue.

She had entered the United States in 1997 and applied for asylum in 2007, but despite the lapse of time her application was timely. Unlike a motion to reopen a removal proceeding following a final order of removal, an asylum application is still timely after the one-year deadline has passed if the applicant demonstrates "changed circumstances which materially affect the applicant's eligibility for asylum," 8 U.S.C. § 1158(a)(2)(D), even if they aren't changed circumstances in "the country of feared persecution." They can be the consequence of "activities the applicant becomes involved in outside [that] country." 8 C.F.R. § 1208.4(a)(4)(i)(B); see *Chen v. Gonzales*, 498 F.3d 758, 759-60 (7th Cir. 2007). The "activity" in this case was the birth of the petitioner's second child, and it has changed her circumstances by exposing her to a risk of involuntary sterilization if she is removed from the United States.

She testified at the hearing before the immigration judge that shortly after the birth of this child the local authorities in the Chinese village from which she comes—who may have learned of the birth from her parents' having, as is customary, thrown a party to celebrate it—ordered her (via a letter to her father) to report within five days for sterilization; and that when she didn't report, the authorities revoked her village

registration. Not being registered, she would if she returned to China be denied various government benefits, such as health care, and she might also face obstacles to employment. See U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices for 2011: China* 37 (2012) (hereinafter cited as *Country Report: China*); Congressional-Executive Commission on China, "China's Household Registration (Hukou) System: Discrimination and Reform," 109th Cong., 1st Sess. 11-12, 23 (Sept. 2, 2005). She further testified that the fact that her children, having been born in the United States, were U.S. citizens would not spare her from having to be sterilized for having violated China's one-child policy, since she and her husband are not U.S. citizens.

Although the Justice Department argues that forcible sterilization is against Chinese law, it's not clear that there is such a law. See *Country Report: China* 50-51; Immigration and Refugee Board of Canada, "China: Family Planning Laws, Enforcement and Exceptions in the Provinces of Guangdong and Fujian," Oct. 1, 2012, www.unhcr.org/refworld/country,,IRBC,,CHN,,50a9fb482,0.html (visited May 6, 2013). And if there is such a law, it seems that the authorities in Fujian either don't know or don't care about it or "resort to extra-legal means of enforcement [of the one-child policy, which remains national policy] in order to avoid being penalized themselves for not meeting birth planning goals." Edwin A. Winckler, "Chinese Reproductive Policy at the Turn of the Millennium: Dynamic Stability," 28 *Population & Development Rev.* 379,

397 (2002). "[I]ntense pressure to meet birth limitation targets set by government regulations [have] resulted in instances of local family-planning officials using physical coercion to meet government goals . . . . In the case of families that already had two children, one parent was often pressured to undergo sterilization." *Country Report: China* 51. In short, "the use of coercive measures in the enforcement of population planning policies remains commonplace." Congressional-Executive Commission on China, *Annual Report* 153 (2009).

Article 18 of the Population and Family Planning Regulation of Fujian Province provides that "those who have become pregnant in violation of this Regulation [which includes the one-child policy] should take remedial measure in time." www.unhcr.org/refworld/country,,, LEGISLATION,CHN,,4242b7394,0.html (visited May 6, 2013). The term "remedial measure in time" is a euphemism for abortion. Congressional-Executive Commission on China, *Annual Report* 153 (2009). Recent instances of forced abortion in Fujian have been documented. See Edward Wong, "Reports of Forced Abortions Fuel Push to End Chinese Law*," N.Y. Times*, July 23, 2012, p. A1; Congressional-Executive Commission on China, *Annual Report* 92 (2012) and *Annual Report* 112 (2011). It would be no surprise if a woman who avoided the threat of forced abortion by having a second child in the United States would if she returned to China be subject to compulsory sterilization. For evidence, besides that submitted by the petitioner, that forced sterilization is continuing in Fujian, see, e.g., *Country Report: China* 50-51; Congressional-Executive Commission on China, *Annual*

*Report* 90-91 (2012), *Annual Report* 111 (2011), *Annual Report* 119 (2010), and *Annual Report* 154-56 (2009); Immigration and Refugee Board of Canada, *supra*, §§ 3.3, 4; "Woman Flees Forced Sterilization," *Radio Free Asia*, Jan. 12, 2012, www.rfa.org/english/news/china/child-01122012145358.html; "Apology for Forced Sterilization," *Shenzhen Daily News*, Nov. 2, 2011, www.szdaily.com/content/2011-11/02/content_6196079.htm (both websites were visited on May 6, 2013). We note with disapproval that the Board without explanation systematically ignores the annual reports of the Congressional-Executive Commission on China, several of which we have cited, even though they are pertinent official publications of the federal government. *Ni v. Holder*, No. 12-2242, 2013 WL 1776501, *5-6 (7th Cir. Apr. 26, 2013).

We complained in *Zheng v. Holder*, 666 F.3d 1064, 1068 (7th Cir. 2012), about the Board's insouciant attitude toward evidence of forced sterilization in Fujian, an attitude illustrated by the Board's opinion in this case. It relies heavily on a report by the State Department for the proposition that "physical coercion to achieve compliance with population control goals is uncommon" and indeed that no evidence had been found "of forced abortions or sterilization in Fujian in the prior 10 years." That's not what the report says. It says that "*according to the Fujian Province Birth Planning Committee (FPBPC), there have been no cases of forced abortion or sterilization in Fujian in the last 10 years,*" U.S. Department of State, Bureau of Democracy, Human Rights and Labor, Office of Country Reports and Asylum Affairs, *China: Profile of Asylum Claims and Country Conditions* 26

(May 2007) (emphasis added). Since forced sterilization is against China's publicly declared policy (though, as we noted, maybe not against Chinese law), one hardly expects local officials to be confessing publicly to engaging in the practice, though we'll note such a confessional statement shortly. The report's next sentence—ignored by the Board—is that "it is impossible to confirm this claim [the claim of the Fujian Provincial Birth Planning Committee that there have been no forced abortions or sterilizations in Fujian for the last ten years], and, in 2006, reportedly, there were forced sterilizations in Fujian." (The Justice Department's brief in this court is even more egregiously selective in its quotations from the May 2007 report, illustrating the frequently obstinate manner in which the Department defends the Board's rulings in asylum cases, see, e.g., *Smykiene v. Holder*, 707 F.3d 785, 790 (7th Cir. 2013); *Lam v. Holder*, 698 F.3d 529, 534-36 (7th Cir. 2012); *Pasha v. Gonzales*, 433 F.3d 530, 537 (7th Cir. 2005), as by repeatedly flouting the *Chenery* doctrine; see the following cases cited in *Smykiene*: *Sarhan v. Holder*, 658 F.3d 649, 661 (7th Cir. 2011); *Atunnise v. Mukasey*, 523 F.3d 830, 838 (7th Cir. 2008); *Comollari v. Ashcroft*, 378 F.3d 694, 696 (7th Cir. 2004); *Carpio v. Holder*, 592 F.3d 1091, 1096 (10th Cir. 2010).)

The State Department's 2007 report distinguishes (at p. 26) "coercion through public and other pressure" to undergo sterilization from coercion through "physical force." The Board has latched on to the distinction, ignoring the fact that the use of physical force is only one method of coercion, of persecution. *Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011). The petitioner argues

without contradiction that unless she underwent sterilization upon returning to China she wouldn't be allowed to register her children, young children whom she would be bringing with her rather than leaving in the United States. Denial of registration could be severe punishment: Chinese "parents must register their children in compliance with the national household registration system within one month of birth. Children not registered cannot access public services." *Country Report: China* 56; see also *Shi Chen v. Holder*, 604 F.3d 324, 328 (7th Cir. 2010); *Chen Shi Hai v. Minister for Immigration & Multicultural Affairs*, [2000] HCA 19 (Australia: High Court, Apr. 13, 2000), www.unhcr.org/refworld/docid/3ae6b6df4.html (visited May 6, 2013); Congressional-Executive Commission on China, *Annual Report* 96-97 (2012); Immigration and Refugee Board of Canada, "China: Treatment of 'Illegal,' or 'Black,' Children Born Outside the One-Child Family Planning Policy" June 26, 2007, www.unhcr.org/refworld/docid/46c403821f.html (visited May 6, 2013).

It's been charged that the right to take college entrance exams may be denied to unregistered children. Jiang Xueqing, "Some Still Face Question of Identity," *China Daily*, Mar. 26, 2013, www.chinadaily.com.cn/2013-03/26/content_16344491.htm (visited May 6, 2013). That could be thought a form of coercion. We have held that financial coercion to undergo sterilization is a ground for asylum, *Lin v. Mukasey*, 532 F.3d 596, 598 (7th Cir. 2008); forbidding kids to attend college because of a parental violation of the one-child policy could be considered a ground for asylum as well. In fairness to Fujian

we note that the province, suffering as it does from a shortage of skilled labor, is participating in a pilot program, to be conducted next year, that will relax college eligibility requirements for applicants who are not locally registered because they are the children of migrant workers. Such children will be eligible to sit for the college entrance exam if they have completed three years of high school in Fujian. Han Yuting, "Fujian to Pioneer Gaokao Reform," *The Economic Observer*, June 4, 2012, www.eeo.com.cn/ens/2012/0604/227672.shtml (visited May 6, 2013). But the petitioner's children are not the children of migrant workers but instead the progeny of violators of the one-child policy. We don't know whether they would be eligible to participate in the pilot program, or whether the program will be made permanent.

The petitioner submitted a number of personal letters, along with communications from the local authorities in the part of Fujian Province where her family lives, in support of her claim to be at risk of forced sterilization if she is returned. The Board gave no weight to communications from the local authorities, on the ground that the communications had not been authenticated and might therefore be forgeries. Yet how realistic is it to expect the petitioner to be able to obtain an authenticated copy of a communication from a local official that states an intention to violate Chinese national policy (whether or not codified in a law) against resorting to sterilization to punish violations of the one-child policy or deter future violations?

The Board has a pinched conception of "authentica-
tion." Obviously a document must be authentic rather
than a forgery to be admissible in evidence. But "docu-
ments may be authenticated in immigration proceedings
through any recognized procedure," *Georgis v. Ashcroft*,
328 F.3d 962, 969 (7th Cir. 2003), quoting approvingly
*Khan v. INS*, 237 F.3d 1143, 1144 (9th Cir. 2001); see also
*Shtaro v. Gonzales*, 435 F.3d 711, 717 (7th Cir. 2006); *Gen
Lin v. Attorney General*, 700 F.3d 683, 687 (3d Cir. 2012);
*Jiang v. Gonzales*, 474 F.3d 25, 29 (1st Cir. 2007); *Yongo v.
INS*, 355 F.3d 27, 31 (1st Cir. 2004). Some of the recog-
nized procedures are set forth in Article IX of the Federal
Rules of Evidence, where we read that "to satisfy the
requirement of authenticating or identifying an item
of evidence, the proponent must produce evidence suf-
ficient to support a finding that the item is what the
proponent claims it is." Fed. R. Evid. 901(a).

The Board disregards these authorities and even imag-
ines that the only method of authenticating a foreign
official document is a certification procedure, either the
one set forth in Fed. R. Evid 902(3), or the one in the
Board's own regulations, 8 C.F.R. §§ 287.6(b), 1287.6(b)
(these are identical regulations, the first applicable to
proceedings before the Board, the second to proceedings
before immigration judges). It isn't the only path to
admissibility. *Vatyan v. Mukasey*, 508 F.3d 1179, 1182-84
(9th Cir. 2007). The path laid out in Rule 902(3), which
requires certification by U.S. or foreign diplomatic
officials, is a form of what is called "self-authentication,"
which is an *alternative* to authentication by evidence, not
a form, let alone a mandatory form, of authentication.

(Rule 902 is captioned "Evidence That Is Self-Authenticating.") The Board's regulations, though otherwise similar to Rule 902, contain language implying that the method they specify is the only permissible method of establishing the admissibility of a foreign official document. But it's not, as held in *Liu v. Ashcroft*, 372 F.3d 529, 532-33 (3d Cir. 2004), in reliance on a government submission to that effect. The government further acknowledged in that case that "asylum applicants can not always reasonably be expected to have an authenticated document from an alleged persecutor." *Id*. at 532. "It is obvious that one who escapes persecution in his or her own land will rarely be in a position to bring documentary evidence or other kinds of corroboration to support a subsequent claim for asylum. . . . Common sense establishes that it is escape and flight, not litigation and corroboration, that is foremost in the mind of an alien who comes to these shores fleeing detention, torture and persecution." *Senathirajah v. INS*, 157 F.3d 210, 215-16 (3d Cir. 1998).

One of the documents that the Board refused to consider had been posted on a Fujian government website. That document (which we'll call the "Robert Lin" document), captioned "Beautiful Family," was issued by Fujian's Population and Procreation Planning Committee, which may be the same organization as the Fujian Provincial Birth Planning Committee, mentioned earlier, or as the Fujian Province Population and Family Planning Committee, author of another "Beautiful Family" posting: "Reply to Inquiry Regarding: 'Whether or Not [a Person] Must Receive Sterilization Operation,'"

July 23, 2007, www.fjjsw.gov.cn:8080/html/1/286/1982_
2008117845.html (visited May 6, 2013). The Robert Lin
document states that sterilization is mandatory for vio-
lators of the one-child policy, with exceptions that
don't apply to the petitioner. Population and Procreation
Committee of Fujian Province, "Answer to Robert Lin's
Inquiry: 'Family Planning Policy with Respect to
People Returning to China from Overseas,'" May 6, 2008,
www.fjjsw.gov.cn:8080/html/5/383/9626_200856322.html.
(visited Apr. 19, 2013); cf. Population and Family Plan-
ning Regulation of Fujian Province (July 26, 2002), Articles
9-11, 39, 47.

A document posted on a government website is pre-
sumptively authentic if government sponsorship can
be verified by visiting the website itself; and in this case
it can be. See www.fjjsw.gov.cn:8080/html/5/383/9626_
200856322.html (visited May 6, 2013). (gov.cn is "The
Chinese Central Government's Official Web Portal," as
explained in "The Central People's Government of the
People's Republic of China," http://english.gov.cn/
(visited May 6, 2013).) We don't agree that all the informa-
tion available on the Internet is "voodoo." *St. Clair
v. Johnny's Oyster & Shrimp, Inc.*, 76 F. Supp. 2d 773, 774-
75 (S.D. Tex. 1999).

As far as we can tell, the Board ignored the Robert Lin
document—and that's a problem. "We cannot sustain
the exclusion of . . . documents without an explanation
of the basis for the ruling." *Zhang v. Gonzales*, 405 F.3d 150,
155 (3d Cir. 2005). The Robert Lin document cuts the
ground out from under what the Board called the "key

aspect of this case"—that because Chen's children were born abroad, she is in no danger of being forced to undergo sterilization.

As for the letters from members of the petitioner's family, the Board refused to give any weight to them. They are doubtless authentic (not forgeries)—we have held that authentication is not required for "unsworn statements of facts or letters from family members." *Gebreeyesus v. Gonzales*, 482 F.3d 952, 955 (7th Cir. 2007). But they can hardly be thought neutral, reliable sources. Yet the Board also refused to give any weight to a letter reporting a forced sterilization that was written by a person who not a member of the petitioner's family. The Board's ground was that he had written the letter in reference to another immigration case. We can't see what difference that should make.

The Board further discounted the family letters because the coerced sterilizations they reported were not, so far as appears, of women who had had children in foreign countries. But the Board gave no reason to think that this would make a difference to the Fujian enforcers of the one-child policy. Obviously foreigners who visit China with their foreign-born children aren't subject to forced sterilization no matter how many children they have. But the petitioner and her husband are not foreigners. They are citizens of China and of no other country, and their children, though U.S. citizens, will upon returning to China with their parents be deemed Chinese citizens.

The Justice Department's lawyer vehemently denied this at the oral argument, insisting that the children would be considered U.S. rather than Chinese citizens even if they accompanied their mother to China, and so would not count against the one-child policy. The Robert Lin document that the Board unaccountably ignored is only one piece of contrary evidence. Article 5 of the Nationality Law of the People's Republic of China states that "any person born abroad whose parents are both Chinese nationals and one of whose parents is a Chinese national shall have Chinese nationality." www.china.org.cn/english/LivinginChina/184710.htm (visited May 6, 2013). And the website of the Chinese consulate in New York states that "if one or two of his/her parents are foreign citizens or have foreign permanent residence right (e.g. U.S. permanent resident card), the child shall apply for a Chinese visa before travelling to China. If both of his/her parents are Chinese citizens and have no foreign permanent residence right (e.g. U.S. permanent resident card), the child shall apply for a Chinese travel document before travelling to China," www.nyconsulate.prchina.org/eng/lsyw/lszjx/sbqz/cccbu/ (visited May 6, 2013). The parents in this case are not permanent residents of the United States. All that the children would need in order to return to China are travel documents, which are what Chinese citizens require to enter China; visas are for foreigners.

The State Department's 2004 "China Consular Information Sheet" says that "if one or both parents of a child are PRC [People's Republic of China] nationals who have not permanently settled in another country, then China

regards their children as PRC nationals and does not recognize any other citizenship they may acquire at birth, including U.S. citizenship. This is true regardless of where the children are born. Such children are required to enter and depart China on PRC travel documents." http://statelists.state.gov/scripts/wa.exe?A3=ind0501c&L= DOSTRAVEL&E=quoted-printable&P=45392&B=-------_ %3D_NextPart_001_01C4FE47.15A53C20&T=text%2Fhtml; %20charset=iso-8859-1 (visited May 6, 2013). And "advice from the [Chinese] Department of Foreign Affairs and Trade (DFAT) . . . indicates that there are two circumstances in which couples returning to China are exempt [from the one-child policy] . . . . The first exemption applies to couples who have permanent residency rights in another country, also known as 'Overseas Chinese'. The second exemption applies to Chinese nationals who have returned to China with a second child after studying overseas for more than one year." Australia: Refugee Review Tribunal, Research Response, "China: 1. Please Obtain Updated Information on the Situation of Children Born Outside the PRC in Breach of the Family Planning Regulations," Oct. 14, 2009, CHN35531 (citations omitted), www.mrt-rrt.gov.au/CMSPages/ GetFile.aspx?guid=cf4bd8ca-6b5f-46db-b525-39837a542362 (visited May 6, 2013); see also Shan Juan, "Babies Born Abroad May Trigger Fines," *China Daily*, Sept. 9, 2011, www.chinadaily.com.cn/china/2011-09/09/content_ 13654286.htm (visited May 6, 2013); Kit Gillet, "Hong Kong Crackdowns on Chinese Families Looking to Get Around One-Child Policy," *Toronto Star*, May 16, 2012, www.thestar.com/news/world/2012/05/16/ hong_kong_crackdowns_on_chinese_families_looking_

to_get_around_onechild_policy.html (visited Mar. 14, 2013). The petitioner, a waitress, fits neither exception.

All this said, considerable uncertainty about the application of the one-child policy, and about the sanctions for violating it when a second or subsequent Chinese child is born abroad, remains. See, e.g., Australia: Refugee Review Tribunal, Research Response, "China: 1. Are There any More Recent Reports on the Treatment of 2nd or 3rd Children Born Overseas If They Return to China (With Particular Reference to Fujian)?," Sept. 25, 2006, CHN30673, www.unhcr.org/refworld/docid/4b6fe158c.html (visited May 6, 2013); Adam Minter, "China's 'Birth Tourism' Isn't About the U.S.," *Bloomberg World View*, Nov. 3, 2011, www.bloomberg.com/news/2011-11-03/china-s-birth-tourism-isn-t-about-the-u-s-adam-minter.html (Nov. 3, 2011); Rob Gifford, "Born In The U.S.A.? Some Chinese Plan It That Way," *NPR*, Nov. 22, 2010, www.npr.org/2010/11/22/131513165/born-in-the-u-s-a-some-chinese-plan-it-that-way (both websites visited May 6, 2013). Nor can we find any responsible estimate of the probability that a violator of the one-child policy will be detected and severely punished.

In this fog of uncertainty one is tempted to treat the question whether the petitioner has a well-founded fear of persecution if returned to Fujian as one of discretion, to be left to the Board to answer, in recognition of its greater experience with asylum applications than the federal courts of appeals have. But the right to exercise discretion in particular circumstances is earned rather than blindly bestowed. We find no indica-

tion, either in this case or in previous ones involving asylum applications based on fear of coercive enforcement of the one-child policy (most recently *Ni v. Holder*, *supra*), that the Board has attempted to marshal the considerable literature (academic, journalistic, diplomatic, judicial) on the nature and enforcement of the policy—that it has tried in other words to construct an empirical basis, however unavoidably crude rather than precise, for its skeptical attitude toward these applicants.

What surely did not meet the Board's responsibility for the reasoned administration of asylum law in the present case was its brushing aside—with a cropped reference to the State Department report of May 2007—the question whether the petitioner faces a substantial risk (however difficult to quantify) of compulsory sterilization if she is removed to China. The combination of the Board's inaccurate representation of the report on which it so heavily relied, disregard of other evidence, and erratic treatment of the documents submitted by the petitioner deprives the Board's order denying asylum of a rational foundation. See also *Ni v. Holder*, *supra*.

The order is therefore vacated and the case remanded.