In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3581

SHU HAN LIU,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent*.

Petition to Review Order of
the Board of Immigration Appeals.
No. A077-354-003.

ARGUED MAY 1, 2013—DECIDED JUNE 3, 2013

Before BAUER, POSNER, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. The petitioner, a Chinese citizen, entered the United States in 2001, at the age of 18, and forthwith applied for asylum on the ground that if returned to China she would be punished for having refused to marry a Communist Party official. Her application for asylum was denied and in 2004 she was ordered removed. She stayed, and last year applied to

reopen her removal proceeding in order to apply for asylum and withholding of removal on the ground of changed conditions in China. In 2011 she had converted to Christianity, and she argues that if removed to China her religious beliefs would compel her to join a Christian church not recognized as legitimate by the Chinese government and to proselytize, which the government forbids, and as a result she would face persecution.

The Chinese government is suspicious of religion. It fears religious sects as potential incubators of rebellion and denounces many of them as "cults." U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *International Religious Freedom Report for 2011: China* 4 (2012); Guobin Zhu, "Prosecuting 'Evil Cults': A Critical Examination of Law Regarding Freedom of Religious Belief in Mainland China," 32 *Human Rights Q.* 471, 486 (2010). Although Article 36 of the Constitution of the People's Republic of China says that Chinese citizens "enjoy freedom of religious belief," it qualifies this by stating that the "state protects *normal* religious activities" (emphasis added). As explained in Congressional-Executive Commission on China, *Annual Report* 7 (2006), the Chinese government's "2004 Regulation on Religious Affairs (RRA)…emphasizes government control and restrictions on religion. The RRA articulates general protection only for freedom of 'religious belief,' but not for expressions of religious belief. Like earlier regulations, it also protects only those religious activities deemed 'normal,' without defining this term." Under Article 300 of China's criminal code, involvement with a cult is punishable: "Whoever forms or uses superstitious

sects or secret societies or weird religious organizations or uses superstition to undermine the implementation of the laws and administrative rules and regulations of the State shall be sentenced to fixed-term imprisonment of not less than three years but not more than seven years; if the circumstances are especially serious, he shall be sentenced to fixed-term imprisonment of not less than seven years." Congressional-Executive Commission on China, "Criminal Law of the People's Republic of China, Article 300," www.cecc.gov/pages/newLaws/ criminalLawENG.php. (visited May 23, 2013).

Naturally the government is suspicious of Christianity—a Western import. It requires Christian churches to register with the government, insists they comply with the doctrines of state-approved "patriotic religious associations," keeps careful tabs on them, and forbids church members to proselytize. *International Religious Freedom Report for 2011*, *supra*, at 1, 7-8; Congressional-Executive Commission on China, *Annual Report* 94, 103 (2011), *Annual Report* 108 (2010), *Annual Report* 132-35 (2009).

Unsurprisingly a majority of Christians in China do not consider the registered churches authentic and join unregistered churches, called "house" churches—frequently they are in private homes, as in early Christianity. The house churches resist, and often defy, the constraints that the government imposes on the registered churches. Pew Forum on Religion & Public Life, *Global Christianity* 58 (2011). "'The bottom line is that house church members believe in Jesus, not the party's version of Jesus,' said Zhang Minxuan, a pastor and president

of the Chinese House Church Alliance, who says he has been detained 41 times." Quoted in Andrew Jacobs, "Illicit Church, Evicted, Tries to Buck Beijing," *N.Y. Times*, Apr. 17, 2011, p. A4. The registered churches return the enmity of the house churches. A leader of a registered church has complained that western Christian churches "interfere, and this slows the work of the church in China. First, we're trying to build up a nondenominational, unified church, and yet overseas denominations are trying to revive denominationalism here. Second, there is theological interference. They criticize, saying that under communism one cannot operate a church; we are citizens of heaven; we don't need to be under any government. And third, they want to negate the independence of the church in China, and instead set up a mother-son relationship with churches overseas." Quoted in Mark Galli, "The Chinese Church's Delicate Dance: A Conversation with the Head of the Protestant Three-Self Patriotic Movement," *Christianity Today*, Nov 1, 2004, www.christianitytoday.com/ct/2004/november/ 30.68.html (visited May 6, 2013). U.S. Commission on International Religious Freedom, *Annual Report* 37 (2013), reports that at least 18 house churches have been classified as cults, and Congressional-Executive Commission on China, *Annual Report* 100-11 (2010), reports that the Chinese government "has banned at least 18 Protestant groups with adherents in multiple provinces, as well as many more congregations and movements that are active in only one province." See also U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *International Religious Freedom Report for 2010: China*

2 (2010) ("the government also considered several Protestant Christian groups to be 'evil cults'"); Congressional-Executive Commission on China, *Annual Report* 85 (2012).

Liu is Protestant, and Protestant house churches appear to be more commonly targeted than Catholic ones. See Brian Spegele, "China's Banned Churches Defy Regime," *Wall Street Journal*, July 28, 2011 http:// online.wsj.com/article/SB100014240527023045676045764 51913744126214.html (visited May 23, 2013). Yet the house churches of whatever denomination actually put one in mind of the underground Catholic congregations that formed when Henry VIII wrested control of the English Church from the Pope, and like the members of those congregations the members of the house churches face persecution. See *International Religious Freedom Report for 2011*, *supra*, at 8; Congressional-Executive Commission on China, *Annual Report* 103-05 (2011), *Annual Report* 109-10 (2010), *Annual Report* 136-38 (2009). There have been recent "reports of abuses of religious freedom, including religious prisoners and detainees. The government's respect for and protection of the right to religious freedom [has] deteriorated. During the year [2010] religious affairs officials and security organs scrutinized and restricted the religious activities of registered and unregistered religious and spiritual groups. The government harassed, detained, arrested, or sentenced to prison a number of religious adherents for activities reported to be related to their religious practice. These activities included assembling for religious worship, expressing religious beliefs in public and in private, and publishing religious

texts." *International Religious Freedom Report for 2011, supra*, at 7-8; see also Congressional-Executive Commission on China, *Annual Report* 103-05 (2011); China Aid Association, *2012 Annual Report: Chinese Government Persecution of Christians & Churches in Mainland China* 6 (2013).

Because the petitioner moved to reopen her asylum proceeding after a final order of removal had been entered, her motion was untimely if based only on a change in her activities after coming to this country, such as her conversion. Compare *Chen v. Holder*, No. 12-2563, 2013 WL 1908017, at *1 (7th Cir. May 9, 2013). She had instead to show a change in conditions in China since 2002, the date of her last removal hearing. 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.2(c)(3)(ii). She thus had to show that Chinese persecution of Christians (of her type) had worsened. Otherwise there would be no excuse for her having waited eight years beyond the normal 90-day deadline for reopening.

It is true that had she not converted to Christianity she would have no basis for seeking asylum on the ground that China persecutes Christians. But if her conversion was sincere, what would be the basis (other than untimeliness, which is not a bar to seeking asylum on the basis of changed country conditions) for treating her differently from someone who had converted to Christianity before coming to the United States? The conversion was a change in her personal circumstances, true; but the change would not have exposed her to a risk of persecution in China had it not been for the change in conditions in that country. See *Joseph v. Holder*, 579

F.3d 827, 834 (7th Cir. 2009). The Board of Immigration Appeals has made no finding that her conversion was insincere, a ploy to enable her to avoid removal.

The Justice Department insists that the only change was in the petitioner's personal conditions. That is wrong. It ignores the change in country conditions. In arguing that reopening was barred because the only change was in personal conditions, the Department was once again violating the *Chenery* doctrine. See *Chen v. Holder*, *supra*, at *2, and cases cited there. For the Board had made no mention of a change in personal conditions. The Department commits a second *Chenery* violation by arguing that China leaves small, unobtrusive house churches alone; the argument does not appear in the Board's opinion. It is also a weak argument. An "unobtrusive" house church presumably is one that refrains from proselytizing; and to forbid proselytizing is an infringement of religious liberty—the petitioner asserts without contradiction that her religious faith requires that she proselytize. By their repeated violations of the *Chenery* doctrine, the Justice Department's lawyers are courting sanctions.

We must consider whether the petitioner has a well-founded fear of religious persecution should she return to China and, if so, whether the risk of persecution is greater than it would have been in 2002, the date of her final removal hearing. We have mentioned some evidence that the conditions of religious freedom in China have deteriorated since then, and we'll discuss more later.

The analytic section of the Board's opinion begins mysteriously with the statement that the petitioner "cites the [State Department] Country Reports on China for the years 2001 to 2008, but she does not offer them to support her motion." We don't know what the Board means. She submitted copies with her motion—not that she had to; it was enough for her to cite them since they are public documents to which the Board has ready access. In fact the next sentence in the Board's opinion cites the State Department's 2009 Country Report along with three of the Department's International Religious Freedom Reports.

The opinion cites these four reports in support of the proposition "that China currently allows the practice of Christianity, although there have been reports of the detention of some leaders of underground, or 'house,' churches and harassment of church members." Indeed there have been such reports—many. Yet from the four reports that it cites the Board infers only that the petitioner "has not shown that the arrest of leaders of underground churches and harassment of church members demonstrates that she will suffer mistreatment amounting to persecution upon her return to China based on her practice of Christianity." We can't tell whether the Board thinks that she will be harassed but not persecuted (that the harassment will not be severe enough to amount to persecution) or that the fact that members of house churches are persecuted doesn't mean that she will be persecuted even though she will be joining such a church.

One of the four reports cited by the Board states that "in Beijing the government reportedly pressured landlords to stop renting space to house church groups. During an outdoor worship service, authorities reportedly conducted surveillance, used loudspeakers to warn against unauthorized public gatherings, detained church leaders to prevent them from attending services, and closed public parks to dissuade the groups from gathering." U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices for 2009: China* 15 (2010). In another of the reports cited by the Board we read that "some religious or spiritual groups are outlawed, including the Falun Gong. Other religious groups, such as Protestant 'house churches' or Catholics loyal to the Vatican, are not outlawed, but are not permitted to openly hold religious services unless they affiliate with a patriotic religious association. In some parts of the country, authorities have charged religious believers unaffiliated with a patriotic religious association with 'illegal religious activities' or 'disrupting social stability.' Punishments for these charges range from fines to imprisonment." U.S. Department of State, *International Religious Freedom Report for 2010: China* 1 (Nov. 2010).

In the third report we learn that "police and officials of local [Religious Affairs Bureaus] in some areas disrupted home worship meetings, claiming that participants disturbed neighbors or social order, or belonged to an 'evil religion.' Police sometimes detained for hours or days worshippers attending such services and prevented further worship activities. Police interrogated

church leaders and lay persons about their worship activities at locations including meeting sites, hotel rooms, and detention centers. Non-governmental organizations (NGOs) reported that church leaders faced harsher treatment than members, including greater frequency and length of detention, formal arrest, and reeducation-through-labor or imprisonment." U.S. Department of State, *International Religious Freedom Report for 2009: China* 5 (Oct. 2009).

And in the fourth report we read that "religious groups independent of the five patriotic religious associations have great difficulty obtaining legal status and can be vulnerable to coercive and punitive action by the Public Security Bureau (PSB) and the Religious Affairs Bureau. In parts of the country, local authorities tacitly approved of the activities of unregistered groups and did not interfere with them, reportedly leading to unregistered churches holding worship services attended by hundreds. In other areas local officials punished the same activities by confiscating and destroying property or imprisoning leaders and worshippers." U.S. Department of State, *International Religious Freedom Report for July-Dec. 2010: China* 4 (Sept. 2011).

The Board's opinion ignores not only the most pertinent parts (the ones we've just quoted) of the four reports it itself cited, but also the other reports cited by the petitioner that indicate that Chinese officials persecute members of house churches. See U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices for 2008: China*, § 2.c (2009) ("during

the year there were numerous reports of detention and harassment of unregistered Protestant groups"), *2006 Country Report*, § 2.c (2007), *2005 Country Report*, § 2.c (2006), *2003 Country Report*, § 2.c (2004); Congressional-Executive Commission on China, *Annual Report* 108-10 (2010), *Annual Report* 136-38 (2009); China Aid Association, *2010 Annual Report: Chinese Government Persecution of Christians & Churches in Mainland China* 9 (2011), *2009 Annual Report* 8-9 (2010). Notice that the reports ignored by the Board include not only State Department Country Reports on China but also reports by the Congressional-Executive Commission on China, which like the State Department's Country Reports are official U.S. government documents. We have remarked in two recent cases the Board's unexplained and inexplicable refusal to consult the Commission's reports. *Ni v. Holder*, No. 12-2242, 2013 WL 1776501, *5-6 (7th Cir. Apr. 26, 2013); *Chen v. Holder*, *supra*, at *2.

After citing (and misconstruing) the four reports, the Board veers into a protracted discussion of "the unsworn statement of the respondent's friend in China, in which he claims that he and others" were threatened and fined by police for "spreading the gospel and advertising a Christmas show event." The Board complains that the statement (which the petitioner's friend had mailed to her from China) "is not supported by evidence such as a police report, arrest record, detention release certificate, fine receipt, or statement of others," and "moreover, this unsworn document appears to be created for the purpose of litigation and is from an interested witness not subject to cross-examination." These characterizations are curious. According to his resident

identification card, the writer of this one-page state-ment describing the incident of religious harassment is a contemporary of the petitioner's, a young man who knew her before she moved to the United States. The statement is consistent with evidence credited in official reports, and the writer would no more have dared to swear to its truth before a notary public than he would have dared to ask the police for a record of his arrest or a receipt for the fine he was forced to pay. ("And why do you want these things, young man"? "In order to document Chinese persecution of Christians, such as myself and my friend in America who doesn't want to be sent back here." This is not a conversation that we can imagine taking place.) According to the English-language version of the official Chinese govern-ment website, Chinese notaries must "adhere to the Four Cardinal Principles, uphold the leadership of the Com-munist Party of China, love the socialist motherland, observe laws and discipline, be in good health, and have fine professional ethics." Ministry of Justice, People's Republic of China, *The Notarial System*, www.legalinfo.gov.cn/english/Legal-Knowledge/content/ 2009-02/03/content_1028375.htm (visited May 6, 2013). As the Sixth Circuit has noted, "given the documented persecution of Christians in China, it seems an arbitrarily high threshold to require that letters attesting to gov-ernment abuse and admitting membership in a persecuted organization be notarized." *Yu Yun Zhang v. Holder*, 702 F.3d 878, 881 (6th Cir. 2012).

Granted, the significance of the friend's statement as evidence pales in relation to the significance of evidence

in official and otherwise reputable reports. But why the Board should have made such a fuss over it perplexes us, except as a reflection of the general muddle that it's in over authentication of foreign documents, the muddle we discussed in *Chen v. Holder*, *supra*, at *4.

The last paragraph of the Board's opinion states summarily that the petitioner has failed to demonstrate changed country conditions. By limiting itself to reports dated 2009 or later, however, the Board deprived itself of the ability to compare current conditions in China regarding persecution of members of house churches with conditions in 2002, the date of the petitioner's final removal hearing. Yet remember that the petitioner had cited reports issued in that and subsequent years that the Board had ignored; by ignoring them the Board disabled itself from determining whether persecution of the house churches had worsened since 2002. In addition, the petitioner submitted—and the Board also ignored—reports, and once again they mainly are official federal government publications, which state that persecution of members of house churches is indeed worse today than it was in 2002. Recall our earlier quotation from the State Department's *International Religious Freedom Report for 2011*; see also U.S. Department of State, *International Religious Freedom Report for July-December 2010: China* 1 (2011); Congressional-Executive Commission on China, *Annual Report* 136 (2009); China Aid Association, *2010 Annual Report* 9 (2011). And compare the U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices for 2009: China* 15 (2010) ("several large house churches reported

increased government interference with their activities in periods preceding sensitive anniversaries"), the *2008 Country Report*, § 2.c (2009) ("authorities disrupted church meetings and retreats; detained, beat, and harassed leaders and church members; and confiscated the personal property of church leaders and members."), and the *2005 Country Report*, § 2.c (2006) ("the new regulations require religious groups to register places of worship and authorized the government to define what religious activity is 'normal' and therefore lawful. Spiritual activities in places of worship that have not registered may be considered illegal and participants can be punished"), with the *2002 Country Report*, § 2.c (2003) ("in certain areas in the southeast, government supervision of religious activity was minimal, and registered and unregistered churches were treated similarly by authorities, existing openly side by side)," and the *2001 Country Report*, § 2.c (2002) ("official repression of underground Catholic and Protestant groups in Guangdong and Fujian provinces eased somewhat")—all unaccountably ignored by the Board. Occasionally the later reports repeat almost verbatim characterizations of governmental attitudes toward the house churches from the earlier reports, suggesting no increase in harassment or persecution. The repetitions may have been unintentional, but in any event the Board did not mention them. In sum, the evidence of changed conditions, and that the petitioner faces a significant risk of persecution if she is removed to China, is unrebutted.

The Board's order is vacated and the case returned to the Board for further proceedings consistent with this opinion.